[Civ. No. 12023. Third Dist. Sept. 10, 1968.]

ANGELA RIVERA et al., Petitioners, v. DIVISION OF INDUSTRIAL WELFARE et al., Respondents; CALIFORNIA STATE FLORISTS' ASSOCIATION et al., Real Parties in Interest.

Sheldon L. Green, Clark F. Ide and John P. Kelley for Petitioners.

Greene, Ide, Kelley & Zavala, Sheldon L. Greene, Clark F. Ide, John P. Kelley and Armando Albert Zavala for Petitioners.

No appearance for Respondents.

Thomas C. Lynch, Attorney General, Jay S. Linderman and Jefferson Frazier, Deputy Attorneys General, Bronson, Bronson & McKinnon, John H. Painter, Frederick A. Morgan, Edwin L. Currey, Athearn, Chandler & Hoffman, Walter Hoffman, McDaniel & McDaniel, Leon L. Gordon and Clark Maser for Real Parties in Interest.

Swerdlow, Glikbarg & Shimer, Harry B. Swerdlow, Richard H. Floum and Joel Behr as Amici Curiae on behalf of Real Parties in Interest.

FRIEDMAN, J.—This is a mandate action to compel the State Department of Industrial Relations and the Division of Industrial Welfare to enforce orders regulating minimum wages, maximum hours and working conditions of women and minors employed in agricultural and allied pursuits, also to compel vacation of partial restraints against enforcement which have been issued by the Superior Courts of San Francisco and Los Angeles. Petitioners Rivera and Graham are female agricultural workers who sue for themselves and on

behalf of the class of women and minors employed by growers and packers affected by the wage orders.

The orders, three in number, were adopted by the State Industrial Welfare Commission on September 26, 1967, to become effective February 1, 1968. Order 8-68 (Cal. Admin. Code, tit. 8, § 11110) establishes wages, hours and working conditions for women and minors in industries handling products after harvest. Order 13-68 (*ibid.*, § 11127) affects those working on the farm preparing agricultural products for market, Order 14-68 (*ibid.*, § 11500), those engaged in farming operations. Generally, these orders establish a minimum wage rate of $1.65 per hour, but permit certain minors to be paid a minimum rate of $1.35 per hour. Wages for overtime, i.e., in excess of 40 hours per week, are one and one-half times the standard rates. These three orders were promulgated as part of a series of orders affecting women and minors employed in California industries generally.

Petitioners allege, and the Industrial Welfare Commission (which appears through the Attorney General) admits, that these three agricultural wage orders are not being enforced during this year of 1968. Petitioners charge that because of nonenforcement approximately 100,000 women and minors are being paid less than lawful minimum wages. Genesis of the enforcement agency's nonaction lies in three mandate actions filed by a number of employers and employer organizations on February 1, 1968, the very day the orders were to become effective. Two of these suits (actions Nos. 587891 and 587878) were filed in the San Francisco Superior Court and one (No. 925929) in the Los Angeles Superior Court. In these actions alternative writs of mandate were issued by stipulation, restraining the Division of Industrial Welfare from enforcing the wage orders against the suing employers, but providing for retroactive wage payments should the orders be eventually upheld. The Division of Industrial Welfare then adopted a policy of nonenforcement as to all employers covered by the three disputed orders. None of the superior court actions has reached the point of decision on the merits.

On behalf of the Industrial Welfare Commission, the Attorney General has appeared in the present action, joining in the petitioners' request for relief at the hands of this court. As real parties in interest, the employers who initiated the three superior court suits have appeared in opposition. The Division of Industrial Welfare and the Director of the Department of

Industrial Relations, as well as the Los Angeles and San Francisco Superior Courts, have been named as respondents but have taken no position in this action.

In assuming jurisdiction we were mindful of the rule that a court of appeal does not ordinarily accept supervening jurisdiction involving a lower court action pending in another appellate district. (*Waidley* v. *Superior Court* (1942) 51 Cal. App.2d 690 [125 P.2d 507].) That rule is one of policy, adapted primarily to private litigation. The courts of appeal possess coequal jurisdiction with the Supreme Court to administer extraordinary relief without regard to the existence of appellate jurisdiction over a pending lawsuit to which the relief relates. (Cal. Const., art. VI, § 10; *In re Davidson* (1914) 167 Cal. 727 [141 P. 216].)

Here, weighty reasons of public interest and need impelled assumption of jurisdiction despite the two pending superior court actions. (*Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 828 [27 Cal.Rptr. 19, 377 P.2d 83]; *Perry* v. *Jordan* (1949) 34 Cal.2d 87, 90-91 [207 P.2d 47].) Orderly judicial review may be had without taking new evidence. The affected workers are many, their labor seasonal, their wage rates at the low end of the income scale, their entitlement to the new minimum rates in limbo. Continued uncertainty over labor costs plagues farmers and food processors. Because of agriculture's primacy in the state's economy, the interests of the affected economic groups and of the public are interwoven. These interests cannot abide the standard timetable of ordinary litigation without damage. They will be benefited by encasing in a single, accelerated decision the controversies now split among three separate lawsuits in two separate counties and two separate appellate districts.

The Industrial Welfare Commission is a five-member appointive board in the Division of Industrial Welfare of the State Department of Industrial Relations (Lab. Code, § 70). The division supplies staff and enforcement facilities. (Lab. Code, § 1193.5.) Section 1173, Labor Code, invests the commission with a continuing duty to ascertain the wages, hours and working conditions of women and minors. Section 1177 authorizes the commission to establish its own procedural rules. Section 1178 establishes a basic procedure for the adoption of commission regulations fixing minimum wages, maximum working hours and the working conditions of women

and minors in the various industries of the state.[1] The first basic requisite consists of preliminary investigations and recommendations by wage boards composed of employer and employee representatives in the affected industries plus a commission representative. Section 1180 declares that the proceedings of the wage boards shall be made a matter of record for the use of the commission. The second basic step consists of public hearings by the Industrial Welfare Commission. Section 1181 prescribes publication and mailing of notice of the time and place of the hearings. Section 1182 authorizes the commission to fix minimum wages, maximum working hours and standard labor conditions after the wage board conferences and public hearings. It fixes as the standard for a minimum wage that ''which shall not be less than a wage adequate to supply the necessary costs of proper living to, and maintain the health and welfare of such women and minors.'' ''Health and welfare'' is the standard which governs the fixing of maximum hours and of labor conditions.[2] Section

---

[1]Labor Code, section 1178: ''If after investigation the commission finds that in any occupation, trade, or industry, the wages paid to women and minors are inadequate to supply the cost of proper living, or that the hours or conditions of labor are prejudicial to the health, morals, or welfare of the employee, the commission shall select a wage board to consider any of such matters. Such wage board shall be composed of an equal number of representatives of employers and employees in the occupation, trade, or industry in question; and a representative of the commission to be designated by it, who shall act as chairman of the wage board on request of the commission. The wage board shall report and make recommendations to the commission, including therein:

''(a) An estimate of the minimum wage adequate to supply the necessary cost of proper living to, and maintain the health and welfare of women and minors engaged in the occupation, trade, or industry in question.

''(b) The number of hours of work per day in the occupation, trade, or industry in question, consistent with the health and welfare of such women and minors.

(c) The standard conditions of labor in the occupation, trade, or industry in question, demanded by the health and welfare of such women and minors.

''Before promulgating an order relating to wages, hours, or conditions of labor for the occupation, trade, or industry in question, and after receipt of the report from the wage board, the commission shall prepare proposed regulations for the occupation, trade, or industry in question and then shall hold a public hearing. The proceedings shall be recorded and transcribed and shall thereafter be a matter of public record. Whenever the occupation, trade, or industry in question is statewide in scope, a public hearing shall be held in each of two cities in this state; when it is not statewide, a public hearing shall be held in the locality where the occupation, trade, or industry prevails.''

[2]Labor Code, section 1182: ''After the wage board conference and public hearing, as provided in this chapter, the commission may, upon its own motion or upon petition, fix:

''(a) A minimum wage to be paid to women and minors engaged in

1185 declares that the orders of the commission "when promulgated in accordance with the provisions of this chapter" shall be valid and operative; section 1187, that the commission's findings of fact are conclusive in the absence of fraud; section 1190, that these provisions do not prevent judicial review of the commission's orders and regulations. Section 1204 declares that no order made under section 1182 shall be effective "unless and until" compliance is had with section 1178. Section 1202 directs the Division of Labor Statistics and Research (an agency within the Department of Industrial Relations) to collect such statistics, data and information and to make such investigations as the Industrial Welfare Commission may require.

The commission is authorized to deliberate in executive session before promulgating its orders. (Lab. Code, § 71.1.) All its records are open to public inspection. (Lab. Code, § 71.2.)

The Industrial Welfare Commission commenced proceedings for review of its statewide series of wage orders in 1966. In August and October of that year it designated 13 wage boards, two of which were concerned with the three orders in issue here. One board was directed to inquire into the subject matter of Order 8, regulating off-farm industries handling products after harvest, and Order 13, covering on-farm preparation of agricultural products. Another board was designated for Order 14, covering agricultural occupations. These boards held meetings and, with the other 11 wage boards, submitted recommendatory reports. All these reports were published by the commission in a 67-page pamphlet entitled "Summary of Wage Board Recommendations." This

---

any occupation, trade, or industry in this State, which shall not be less than a wage adequate to supply the necessary costs of proper living to, and maintain the health and welfare of such women and minors.

"(b) The maximum hours of work consistent with the health and welfare of women and minors engaged in any occupation, trade, or industry in this State. The hours so fixed shall not be more than the maximum now or hereafter fixed by law.

"(c) The standard conditions of labor demanded by the health and welfare of the women and minors engaged in any occupation, trade, or industry in this State.

"The commission may thereupon make a mandatory order to be effective on a date fixed by the commission, which date shall be not less than sixty (60) nor more than ninety (90) days from the publication thereof, specifying the minimum wage, the maximum hours, and the standard conditions of labor for women or minors in the occupation, trade, or industry in question. The hours specified shall not be more than the maximum for women or minors in California. Such order shall be published in at least one newspaper in each of the cities of Los Angeles, Sacramento, Oakland, San Jose, Fresno, San Diego, and San Francisco."

summary (which included a statement indicating availability of the full reports in 19 offices of the Division of Industrial Welfare) was mailed to approximately 1,800 interested persons throughout the state. Quite aside from the hearings required by statute, the commission scheduled a series of preliminary public hearings to take testimony on the wage boards' recommendations. Notices of these hearings were widely distributed by mail and by newspaper publication. Public hearings were held in Los Angeles, Fresno and San Francisco on March 27-31, 1967. One hundred sixty-six persons testified at these hearings for approximately five minutes each; their testimony occupies 643 pages of transcript. Responding to the requirements of the last paragraph of Labor Code section 1178 (fn. 1, *supra*), the commission then issued a 59-page summary of "Proposed Revisions of Industrial Welfare Commission Orders" and scheduled additional public hearings. Notice of the time and place of these hearings was widely published in various newspapers and copies of the notice, together with the proposed revision, were mailed to approximately 1,500 employer and employee associations and 1,800 individuals who had registered with the commission. The second series of public hearings was held in Los Angeles, Fresno and San Francisco in June and July 1967. Three hundred thirteen persons testified at these hearings for approximately five minutes each; their testimony occupies 1,232 pages of transcript. In addition, 1,023 letters, statements, position papers and other items of correspondence were received by the commission. At the outset of these hearings, the commission announced that each witness should limit his oral statement to five minutes but could file a written statement in addition. At the outset of the hearings an attorney representing a number of agricultural employers requested that each witness be sworn and made available for cross-examination and that as to all evidence, the right of cross-examination and rebuttal be afforded. The commission denied the request. On September 26, 1967, the commission held a public meeting in Los Angeles, at which time it promulgated the entire series of wage orders, three of which are in issue here.

### PROPRIETY OF WAGE ORDER ADOPTION PROCEDURE.

In this court the parties debate approximately the same issues raised in the employers' superior court actions. A salient issue is whether the wage order adoption proceedings of the Industrial Welfare Commission complied with constitu-

tional and statutory procedural demands. The essential tug of war is between the employers' insistence upon a "trial type" hearing featured by opportunities for confrontation, cross-examination and rebuttal, and the commission's pursuit of a quasi-legislative or "argument type" hearing.

Specifically, the employers complain that witnesses who testified at the hearings were not sworn or made available for cross-examination; that experts and staff members who prepared the statistical studies and other evidence considered by the commission were not called to testify or made available for cross-examination; that the commission considered statistical surveys and other information not included in the hearing record, hence beyond cross-examination and rebuttal. The information not included in the hearing record but playing a role in the commission's action was of several kinds: First, after the conclusion of the public hearings in July 1967, the commission received and considered two newly formulated statistical studies.[3] Second, a group of statistical studies published by state and federal agencies were furnished to the commission by its staff but not included in the hearing record.[4] Third, one commissioner made a personal investigation by speaking to women workers and by acquiring employment herself at an hourly rate of $1.30. Fourth, in connection with the adoption of Order 14-68, two commissioners consid-

[3]The first of these was a one-page supplement issued by the Division of Labor Statistics and Research of the State Department of Industrial Relations in August 1967, bringing up to date a study entitled *Budget for A Self-Supporting Working Woman,* popularly known as "Minnie's Budget." The study had been compiled on the basis of consumer living costs and income tax rates prevailing in June 1961 and had been published as a 31-page pamphlet by the Industrial Welfare Commission in December 1961. The one-page supplement adjusted Minnie's Budget from a total annual expenditure need of $2,854.98 in June 1961 to $3,132.56 in June 1967, reflecting increases in consumer prices and tax rates between those dates.

The second item received by the commission after conclusion of the public hearings was an article excerpted from the Monthly Labor Review of June 1967 entitled *Living Costs, Wages, and Wage Policy,* by H. M. Douty. The Monthly Labor Review is published by the Bureau of Labor Statistics, U.S. Department of Labor.

[4]The items in question were: (a) Report 860, No. 11, Estimated Number of Women in California Agriculture by County and Type of Worker, 9/3/66, State Department of Employment, (b) Report of the Advisory Commission on the Status of Women to the Legislature, (c) U.S. Department of Labor, Women's Bureau, Leaflet 4, "State Minimum Wage Laws" and (d) California Department of Education "Hand Book on Work Experience Education" 1965.

ered cost-of-living statistical studies not part of the record and not furnished the other members of the commission.[5]

The Labor Code provisions require public hearings to be held after published and mailed notices have assured affected parties an opportunity for participation. The kind of participation assured by procedural due process and by statute depends, in part, upon the function served by the hearing and, in part, upon the demands of the particular statute.[6] Generally speaking, an adjudicative function implies an adversary proceeding between contending parties who are entitled to access to the evidence and opportunities for cross-examination and rebuttal.[7] In promulgating the wage orders, the Industrial Welfare Commission was not performing that kind of function. Its task was to ascertain the minimal labor conditions which would satisfy the dual statutory standards of cost-of-living and health and welfare. Its function was to receive and consider economic and social data, as well as opinion and argument, covering large numbers of people and wide sectors of the economy; to select a series of positions aimed at the statutory objectives but shaped by discretion and policy; finally, to express its selection in rules regulating the future conduct of relatively broad classes of persons. Thus its function was quasi-legislative rather than adjudicative.[8] The statutory

[5]These were: (a) a family budget study published by the State Department of Social Welfare, Aid to Families with Dependent Children Program; (b) a study of hourly earnings in manufacturing in Kern County, a publication whose sponsor is not designated; (c) a study entitled *Medical Costs in Urban and Rural Areas,* issued in connection with the California Medi-Cal Program.

[6]See *Norwegian Nitrogen Products Co.* v. *United States* (1933) 288 U.S. 294, 303-308 [77 L.Ed. 796, 801-803, 53 S.Ct. 350]; *Ray* v. *Parker* (1940) 15 Cal.2d 275, 304-310 [101 P.2d 665]; 1 Davis, Administrative Law Treatise (1958) pp. 420-437.

[7]Relative to such an adjudicative hearing, it is said: ''Administrative tribunals which are required to make a determination after a hearing cannot act upon their own information, and nothing can be considered as evidence that was not introduced at a hearing of which the parties had notice or at which they were present.'' (*English* v. *City of Long Beach* (1950) 35 Cal.2d 155, 158 [217 P.2d 22, 18 A.L.R.2d 547]; see also, *Greene* v. *McElroy* (1959) 360 U.S. 474 [3 L.Ed.2d 1377, 79 S.Ct. 1400].

[8]See *Opp Cotton Mills, Inc.* v. *Administrator* (1941) 312 U.S. 126, 144 [85 L.Ed. 624, 635, 61 S.Ct. 524]; *Bi-Metallic Inv. Co.* v. *State Board of Equalization* (1915) 239 U.S. 441, 445-446 [60 L.Ed. 372, 375, 36 S.Ct. 141]; *Pitts* v. *Perluss, supra,* 58 Cal.2d at pp. 834-835; *Holloway* v. *Purcell* (1950) 35 Cal.2d 220, 230-231 [217 P.2d 665]; *Ray* v. *Parker, supra,* 15 Cal.2d at p. 304; *Brock* v. *Superior Court,* 109 Cal.App.2d 594, 597-598 [241 P.2d 283]. In *Opp Cotton Mills* v. *Administrator, supra,* administrative determination of minimum wage rates pursuant to statutory standards is called ''an exercise of the legislative function'' (312 U.S. at p. 146 [85 L.Ed. at p. 636]).

obligation to hold hearings, take evidence and make findings creates characteristics shared by adjudicatory proceedings but does not stamp the function with an adjudicative character.[9]

 There is no constitutional requirement for any hearing in a quasi-legislative proceeding; hence, the procedural requirements for conduct of the agency's hearings stem from the particular statute rather than the constitutional demands of procedural due process.[10] In terms of access to evidence and opportunities for cross-examination and rebuttal, decisional pronouncements vary with the terms of the specific statutes. Generally, the demands are far less stringent than those prevailing in adjudicative proceedings. Quasi-legislative administrative agencies have been compared to legislative committees, which hear testimony and argument from contending factions and witnesses (but without cross-examination or rebuttal among the contenders) and which receive independent investigations such as staff studies.[11] It has been pointed out that in hearings preceding the adoption of regulations of wide application, the availability of cross-examination among all the contending parties would impose intolerable burdens. "There must be a limit to individual argument in such matters if government is to go on."[12]

 Minimum wage regulations in several states have been sustained after "argument type" hearings which did not provide opportunities for cross-examination or which were paralleled by independent investigations outside the hearing process.[13] Other state decisions are more stringent, requiring opportunity for cross-examination and rebuttal, as well as confinement to the hearing record.[14]

[9]*Jersey Maid Milk Products Co.* v. *Brock* (1939) 13 Cal.2d 620, 659 [91 P.2d 577]; *Wilson* v. *Hidden Valley Municipal Water Dist.* (1967) 256 Cal.App.2d 271, 279 [63 Cal.Rptr. 889].

[10]*Franchise Tax Board* v. *Superior Court* (1950) 36 Cal.2d 538, 548-549 [225 P.2d 905]; cf. *People* v. *Johnson* (1941) 42 Cal.App.2d Supp. 827, 833 [109 P.2d 770].

[11]See *Ray* v. *Parker, supra*, 15 Cal.2d at p. 307; *Brock* v. *Superior Court, supra*, 109 Cal.App.2d at pp. 605-606.

[12]*Norwegian Nitrogen Products Co.* v. *United States, supra*, 288 U.S. at p. 308 [77 L.Ed. at p. 803], quoting Holmes, J. in *Bi-Metallic Inv. Co.* v. *State Board of Equalization, supra*, 239 U.S. at p. 445 [60 L.Ed. at p. 375]; *Air Lines Pilots Assn., Intl.* v. *Quesada* (2d Cir. 1960) 276 F.2d 892, 896.

[13]*Kiamesha Concord, Inc.* v. *Lewis* (1962) 15 App.Div.2d 702 [223 N.Y.S.2d 602]; *Spokane Hotel Co.* v. *Younger* (1920) 113 Wash. 359 [194 P. 595].

[14]*Martin* v. *Wolfson* (1944) 218 Minn. 557 [16 N.W.2d 884]; *Conti* v. *Department of Labor* (Pa. 1961) 15 Wage & Hour Cas. 13; *McGrew* v. *Industrial Com.* (1938) 96 Utah 203 [85 P.2d 608].

Analysis of the California statutes and decisions convinces us that the procedural requirements governing Industrial Welfare Commission hearings fall somewhere between these extremes. The carefully delineated demands of the Labor Code for noticed and recorded hearings are designed to insure fairness and inhibit arbitrariness through the instrumentalities of public participation in the investigative activity and a record paving the way for judicial review. Such assurances cannot be fulfilled by recorded hearings which are paralleled by substantial "off record" investigations. Inherent in the statutory scheme for public hearings preceding the quasi-legislative action of the Industrial Welfare Commission is an assurance that affected parties shall not be deprived of the opportunity to meet and rebut unfavorable evidence.[15]

Various California decisions sanction quasi-legislative procedings which exclude cross-examination;[16] which do not provide access to the body of information from which statistical compilations or summaries are drawn by the agency's staff;[17] and which dispense with specific and detailed findings.[18] On the other hand, where the agency's staff brings in factual material not available to the public, such as a specially

---

[15]See, *Morgan* v. *United States* (1938) 304 U.S. 1, 18-19 [82 L.Ed. 1129, 1132-1133, 58 S.Ct. 773]; *Morgan* v. *United States* (1936) 298 U.S. 468, 480-481 [80 L.Ed. 1288, 1294-1295, 56 S.Ct. 908]; *Franchise Tax Board* v. *Superior Court, supra,* 36 Cal.2d at pp. 549-550; *Olive Proration etc. Com.* v. *Agricultural Prorate Com.* (1941) 17 Cal.2d 204, 210 [109 P.2d 918]; *Ray* v. *Parker, supra,* 15 Cal.2d at pp. 296-299; *United Air Lines, Inc.* v. *Industrial Welfare Com.* (1963) 211 Cal.App.2d 729, 754, 756 [28 Cal.Rptr. 238].

Professor Davis criticizes the approach which first classifies the administrative function as quasi-judicial or quasi-legislative, then fixes a corresponding set of minimum procedural requirements. (1 Davis, Administrative Law Treatise, *op. cit. supra,* pp. 415-419.) He draws a distinction between adjudicative facts ("roughly the kind of facts that go to a jury") and legislative facts which "do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law and policy and discretion." (*Ibid.,* p. 413.) He would require a trial type of hearing for inquiries into the former, an argument type hearing for the latter. (*Ibid.,* pp. 415, 429-430.)

[16]*Emby Foods, Inc.* v. *Paul* (1964) 230 Cal.App.2d 687, 702-703 [41 Cal.Rptr. 365].

[17]*Security-First Nat. Bank* v. *Franchise Tax Board* (1961) 55 Cal.2d 407, 419-421 [11 Cal.Rptr. 289, 359 P.2d 625]; *City & County of San Francisco* v. *Superior Court* (1951) 38 Cal.2d 156, 162 [238 P.2d 581]; *Franchise Tax Board* v. *Superior Court, supra,* 36 Cal.2d at pp. 548-552; *Ray* v. *Parker, supra,* 15 Cal.2d at pp. 303-307; *Emby Foods, Inc.* v. *Paul, supra,* 230 Cal.App.2d at p. 703.

[18]*Wilson* v. *Hidden Valley Municipal Power Dist., supra,* 256 Cal. App.2d at p. 286; *United Air Lines, Inc.* v. *Industrial Welfare Com., supra,* 211 Cal.App.2d at p. 754.

conducted survey, the parties must be apprised of it during the hearing process and cross-examination and rebuttal permitted.[19]

Implicit in these decisons is a distinction between two kinds of evidence: one which is not generally available to the public, thus depending upon confrontation as a precondition of rebuttal; the other, generally available data and argument which can be countered without advance confrontation.

When the evidentiary material consists of private facts rather than public conditions or of a special investigation conducted for the purpose of the particular determination and is not generally available to the public during the hearing process, its incorporation in the hearing record may be an indispensable condition of fairness. Other evidence deals with public conditions rather than private facts and is so generally available that fairness does not demand its display in the administrative record, for any percipient party may acquire and use it by analysis and research in advance of the hearing. Evidence of the latter sort frequently takes the form of statistical compilations and of economic and social studies, some published by federal and state agencies, others issued under the aegis of educational institutions or chambers of commerce but available through standard research sources such as libraries and public document depositories. Published studies of this sort are available to all who care to collect and use them. Even in the relatively strict precincts of judicial inquiry, published research material on social and economic conditions is habitually used without entering it in evidence, without putting the author under oath or cross-examining him.[20] It is equally available to assist the process of administrative legislation. An impeccably arranged process would incorporate all such material before or during the hearings and announce its presence to all, thus avoiding dissatisfaction, protest and legal attack.[21] Reviewing courts, however, are

[19]*Olive Proration etc. Com.* v. *Agricultural etc. Com., supra,* 17 Cal.2d at p. 210; see also *Ray* v. *Parker, supra,* 15 Cal.2d at pp. 303-310; *Franchise Tax Board* v. *Superior Court, supra,* 36 Cal.2d at pp. 549-550.

[20]The ''Brandeis brief,'' which brings social statistics into the courtroom, has become a commonplace. A measure of fame now surrounds footnote 11 in *Brown* v. *Board of Education* (1954) 347 U.S. 483, 494 [98 L.Ed. 873, 880, 74 S.Ct. 686, 38 A.L.R.2d 1180], which cites published sociological and psychological studies for the proposition that racial segregation tends to retard educational and mental development. See 1 Davis, *op. cit. supra,* pp. 429-430.

[21]Several state administrative procedure statutes require notification of technical and scientific data which is to receive consideration. (See 9 Wigmore, Evidence (3d ed.) 1964 Pocket Supplement, § 2568.)

concerned with minimum procedural demands. No unfairness occurs when the agency makes use of published research material which is available to the public generally.[22]

Another kind of "evidence" is judgmental rather than factual. In the nomenclature of the judicial process, *evidence,* including the *testimony* of *witnesses,* is presented to produce belief in the existence of facts. (See Cal. Evid. Code, §§ 140, 190.) Transported into the legislative process, this nomenclature tends to evoke spurious responses. Thus *witnesses* appear to *testify* or give *evidence* before legislative investigating committees. Actually, most such witnesses utter opinion and argument rather than recollection or narration, seeking to produce belief in *ideas* rather than proof of facts. Stripped of verbal garments borrowed from the judicial process, such utterances may be viewed in their true character and met on their own terms, vulnerable to rebuttal by counterargument and countervailing opinion without cross-examination as the attritional prelude. In quasi-legislative as in legislative inquiries, absence of cross-examination does not significantly impair the parties' ability to meet and rebut argumentative testimony.

The subject of the Industrial Welfare Commission's investigation and the basis for its decisions were an amalgam of fact and judgment. The more factual phases consisted of collective rather than individualized facts and conditions. At the inception of the statutory proceedings, in the fall of 1966, the commission staff supplied the two wage boards with extensive study material, largely dealing with agricultural labor economics. Much of this material had been published by federal and state agencies, while other items emanated from chambers of commerce and educational institutions. There is no claim of inaccessibility regarding this material. The pamphlets and documents which later came into the hands of commission members in alleged violation of the public hearing provision are few in comparison. From the descriptions, all the questioned items appear to have been published by federal and state agencies. With one exception, they were not specially formulated for the purpose of the commission hearings but consisted of research material available to the public generally, including the present real parties in interest. (See fns. 3,

[22]Real parties in interest do not charge deliberate secrecy on the part of the Industrial Welfare Commission or its staff or violation of Labor Code section 71.2, which makes commission records available for public inspection.

4, 5, *supra*.) Failure to incorporate them into the record during the hearings did not violate minimum procedural requirements.

The commission's investigation as well as its determinations were judgmental as well as factual. The commission was directed by law to arrive at concrete judgments by the standard of relatively indeterminate statutory words, for example, a wage *adequate* to supply the *necessary* costs of *proper* living and to maintain the *health* and *welfare* of women and minors. What was adequate, what was necessary, what was proper, what maintained welfare, formed as much a judgmental decision as factual. Such decisions are not born out of statistics alone. They are fashioned by argument; by recognition of contending needs, benefits and burdens; by balancing the interests of those receiving the benefit and those who bear the cost. Underlying the statistics of Minnie's Budget (fn. 3, *supra*) are value judgments of the food Minnie eats, the quarters she inhabits, the clothing she wears and the number and extent of miscellaneous needs which fix her relationship to a bottom level of bare subsistence. Such judgmental inclinations do not permit flight from facts and figures. They are implicit, nevertheless, in the statutory standards. An examination of the transcript of commission hearings bears out this view. Much of the ''testimony'' before the commission consisted of argument, of appeals to understanding the employees' needs or the employers' burdens. To impose upon such witnesses an oath to tell the ''truth'' would elevate persuasion to the level of moral certitude. Multilateral cross-examination of such ''testimony'' would mask counterargument and clog the hearing process to the point of frustration. The statutory hearing requirement did not demand such anarchic debate.

Real parties in interest assert that they were denied the opportunity to cross-examine members of the commission staff who prepared statistical studies and other evidence considered by the commission. With the single exception noted earlier, they have not pointed to any staff study or investigation made for the purpose of these hearings and not available to the general public. Indeed, some of their briefs complain of the absence of affirmative staff presentation. The exception consists of the one-page supplement updating the 1961 Minnie's Budget to 1967. The supplement was prepared by the Division of Labor Statistics and Research to include price adjustments to June 1967. Apparently it had not been completed at the

time of the last public hearing in July 1967 and, according to commission records, was delivered to the commission members on September 6, 1967, several weeks before adoption of the disputed orders. While a state government publication, it was not publicly available before or during the public hearings. Hence parties aggrieved by the commission's orders had no opportunity to rebut it. The parties seem to agree that Minnie's Budget played a fairly important role in the commission's decision.

Although the real parties in interest correctly assert denial of an opportunity to review and rebut Minnie's 1967 budget during the public hearings, the assertion is nothing but an abstraction, a claim of pain without injury. Neither in their superior court petitions nor in this court have they charged any error, fault or omission in the one-page 1967 supplement. Minnie's Budget of 1961, in the form of a 31-page printed pamphlet, was available for review and attack during the public hearings. Based on June 1961 prices, it expressed a self-supporting working woman's annual need of $2,334.90 for commodities and services "to maintain a minimum but adequate mode of living" plus an annual tax burden of $520.08. The 1967 supplement adjusted the 1961 figures to reflect the changes in cost-of-living indicated by the consumer price index of the United States Bureau of Labor Statistics and to reflect changes in tax rates. Essentially, the 1967 supplement resulted from an elementary mathematical calculation applied to the 1961 figures. The surface appearance is one of acceptability. Real parties in interest make no attempt to peer beneath the surface.

The same abstract complaints characterize the other challenged documents. ▮▮▮ Mandamus will be granted to protect a party against substantial damage, not to vindicate abstract claims; issuance of the writ is not a matter of right, but involves a consideration of its effect in promoting justice; likely public detriment warrants denial of relief.[23] In this phase of their superior court actions, real parties in interest posed abstract complaints of denied rebuttal opportunity against elaborate and extended adoption proceedings, heavy public and private expenditures of time and money and the expectations of the affected employees. In balancing abstrac-

[23]See *Parker* v. *Bowron* (1953) 40 Cal.2d 344, 351 [254 P.2d 6]; *Bartholomae Oil Corp.* v. *Superior Court* (1941) 18 Cal.2d 726, 730 [117 P.2d 674]; *Slater* v. *City Council* (1965) 238 Cal.App.2d 864, 868 [47 Cal.Rptr. 837]; *Ferenz* v. *Superior Court* (1942) 53 Cal.App.2d 639, 643 [128 P.2d 48].

tions against public disadvantage, this phase of their superior court actions presented no substantial ground for the exercise of discretion in their behalf. It poses equal lack of appeal as a basis for this court's deference to the temporary restraints issued by the superior courts.

Under the circumstances here, personal study and research by individual commissioners did not violate the public hearing requirement. At the meeting at which the wage orders were adopted, two commissioners explained their refusal to accept a differential between urban and rural minimum wage rates. At that point they referred to the statistical studies described in footnote 5, *supra,* to buttress their position. Such studies were as available to real parties in interest as to the two commissioners.

The commissioner who personally tested the experience of a female worker employed at $1.30 per hour and talked to female agricultural workers did no more than augment the individual expertise and depth of understanding necessary to well-founded individual decisions. Carried to an extreme, of course, private studies and investigations by the individual members of a tribunal or commission might sap the substance of the group process demanded by statute. In the context of the Industrial Welfare Commission's extensive collective investigation, this individual activity was not of substantial importance and did not transgress the statutory mandate for collective public hearings.

Both in their superior court mandate actions and in this court, real parties in interest have asserted the right to take the testimony of the commission members and staff to ascertain the extent of use and reliance upon data and evidence not included in the hearing record. They cite *Olive Proration etc. Com.* v. *Agricultural Prorate Com., supra,* 17 Cal.2d 204, as a precedent for appointment of a referee to take evidence covering the hearing procedures of an administrative agency. The *Olive Proration* case, where the agency's entire proceeding violated its statutory authority, is not in point. The presumption is that the Industrial Welfare Commission regularly performed its official duty.[24] Real parties in interest have not raised any factual allegation to overcome that presumption,

[24]Evidence Code, section 664; *Ralphs Grocery Co.* v. *Reimel* (1968) 69 Cal.2d 172, 175 [70 Cal.Rptr. 407, 444 P.2d 79]; *Faulkner* v. *California Toll Bridge Authority* (1953) 40 Cal.2d 317, 330 [253 P.2d 659]; *Cosgrove* v. *County of Sacramento* (1967) 252 Cal.App.2d 45, 50 [59 Cal. Rptr. 919]; *Moyer* v. *State Board of Equalization* (1956) 140 Cal.App.2d 651, 655 [295 P.2d 583].

since their claims of multiple violations have been filtered down to a one-page document (the 1967 supplement to Minnie's Budget) and that without any showing of real injury. Only questions of law are before us and the case may be heard on the pleadings and arguments. (Code Civ. Proc., § 1094.)

COMPLIANCE WITH SUBSTANTIVE STANDARDS OF THE
ENABLING STATUTES.

The petitions for mandate in the superior court and the briefs of real parties in interest in this court charge absence of any finding that a minimum hourly rate of $1.65 for women or $1.30 for minors is necessary to meet the statutory standard of ''a wage adequate to supply the necessary costs of proper living . . . and maintain the health and welfare of . . . women and minors'' (Lab. Code, § 1182, subd. (a), fn. 2, *supra*) ; that in any event there is no evidence to support such a finding; that neither the petitioners in this action nor the Attorney General have pointed to such evidence; that Minnie's Budget and other evidence of the living costs of a self-supporting woman employed in an urban locale are inappropriate to agriculture and crop processing, since the majority of women and minors in these fields are temporary, seasonal workers who are not self-supporting but supplementing family income needed to meet the lower living costs prevailing in rural areas.

These arguments misconceive the burdens undertaken by real parties in interest as well as the character of the Industrial Welfare Commission's statutory mandate. A reviewing court does not superimpose its own policy judgment upon a quasi-legislative agency in the absence of an arbitrary decision; rather, the review is limited to an examination of the proceedings to determine whether the action is arbitrary or entirely lacking in evidentiary support or whether the agency has violated the procedure required by law; in these technical matters requiring the assistance of experts and the collection and study of statistical data, courts let administrative boards and officers work out their problems with as little judicial interference as possible.[25]

Either in a lawsuit to restrain or to compel its enforcement, the action of the agency comes before the court with a presumption of correctness and regularity.[26] He who assails the

[25]*Ralphs Grocery Co.* v. *Reimel, supra,* 69 Cal.2d at p. 179; *Pitts* v. *Perluss, supra,* 58 Cal.2d at pp. 832-833, 835; *Ray* v. *Parker, supra,* 15 Cal.2d at p. 311.

[26]See authorities cited footnote 24, *supra.*

agency's action, not its defender, has the burden of demonstrating invalidity. The burden of demonstrating absence of evidentiary support for the commission's action is upon real parties in interest. They have not met it.

The Industrial Welfare Commission is not required to adopt a finding expressly declaring that the specified minimum hourly rates meet the statutory standards, since such a finding is implied from its action.[27]

Basic to review of the commission's minimum wage action is an understanding of the statute, Labor Code section 1182, subdivision (a) (fn. 2, *supra*). It directs the commission to fix a minimum wage for women and minors "which shall not be less than" a wage adequate to supply the described needs. It does not peg the minimum wage at the precise level of adequacy, but fixes adequacy as a minimum level beneath which it shall not be set. The "not less than" phraseology necessarily implies an exercise of discretion and policy by the commission in fixing minimum rates at or at some point above the level of bare adequacy. There is no ambiguity in this statutory language, no reason to delve into legislative purpose or history. The statutory standard of adequacy is a floor and not a ceiling on the commission's wage determinations.[28]

This characteristic of the statute supports the thesis, expressed earlier, that the evidentiary base for the commission's action is judgmental as well as statistical. The policy and discretion allowed to the commission in setting minimum wage rates at or above the minimum level of adequacy permits it to recognize a range of determinants other than the employee's minimum subsistence cost. These include such factors as general wage trends, productivity levels, availability of non-wage benefits, the effect on the labor market, the minimum's relationship to the entire payroll, the economic condition of the employing industry and its capacity to adjust to the increased cost.[29] The implied thesis that minimal subsistence statistics form the exclusive evidentiary basis for minimum wage decisions is rebutted by the statute.

[27]*United Air Lines, Inc.* v. *Industrial Welfare Com.*, *supra*, 211 Cal. App.2d at p. 753.

[28]Absence of an upper statutory limit on the minimum wage does not hand the commission a legislative blank check. At some point disregard of the recommendations and data submitted to the commission would result in invalid, arbitrary action.

[29]See Backman, Wage Determination (D. Van Nostrand Company, Inc., Princeton, New Jersey) (1959); Belloc, Wages in California, Univ. of Cal. Press (1948) pp. 91-94; Tolles, Origins of Modern Wage Theories,

Although impliedly pointing to living costs as the exclusive factor of the wage determinations, real parties in interest object to Minnie's Budget, arguing that it was designed for a fully employed, self-supporting woman, not a seasonally employed woman or minor needing only supplemental income. The objection is untenable. Studies before the wage boards did indeed point to the prevalence of seasonal, temporary workers among the women and minors employed in California agricultural and crop processing.[30] On the other hand, of a national female work force approaching 30,000,000, three out of five women workers are married and inferably providing supplemental family income; among married women, one in three is working.[31] Multiple earners within a single family unit form a pervading characteristic of industrialized American society. The objective of supplemental income rather than complete self-support characterizes a substantial portion of the entire female work force. It is not peculiar to those employed in agriculture. Among the affected families "supplemental" income may make the difference between family dependency and self-sufficiency; also, some seasonally employed women and minors are self-supporting, and others have dependents.[32] The decreased need of the part-time worker is largely illusory, since an hourly rate's adequacy to meet subsistence needs is limited by the number of work hours offered.

These varying characteristics pose the alternatives of wage rate parity and a theoretically conceivable differential between primary and secondary breadwinners. The Industrial

Prentice-Hall, Inc., Englewood Cliffs, New Jersey (1964) pp. 120-125, 192-197.

[30]Cal. Dept. of Employment, Estimated Number of Women in California Agriculture by County and Type of Worker, Report 860, No. 9, Oct. 6, 1966; *Idem.*, Employment and Earnings of Adult Female Workers in California Agriculture, Report 840, No. 16, Oct. 27, 1966; *Idem.*, Youth in California Agriculture, Report 840, No. 14, Oct. 27, 1966.

[31]The President's Commission on the Status of Women, Report of Committee on Private Employment, pp. 1, 47 (1963); American Women Report of the President's Commission on the Status of Women, p. 27 (1963).

[32]One document (Statement of Position, AFL-CIO) before the commission declared that California farm laborers averaged 1,100 hours of work per year. Such a statistic indicates the pooling of family effort necessary to provide minimum family subsistence. Another statistic indicated that of the statewide female labor force, 43.3 percent were without a supporting spouse. (Cal. Dept. of Industrial Relations, Division of Labor Statistics and Research, California Women Power (1966) Table 15.) The latter figure corresponds closely with the Report of the President's Commission (fn. 31, *supra*) indicating that three out of every five women in the work force are married.

Welfare Commission did not establish such a differential nor did it downgrade fully employed workers to the dubiously lesser needs of the partially employed. Its failure or refusal to indulge in that kind of action violated no express or implied standard of Labor Code section 1182.

Another complaint against the statewide rates fixed by the commission is its refusal to allow adjustments for lower living costs in rural areas. Although carrying the burden of demonstrating invalidity, real parties in interest have pointed to no evidence of an actual living cost differential between urban and rural areas of the state. The record of the hearings includes statistics and testimony from which the commission could reasonably conclude that no significant differential exists.

Real parties in interest complain that the hearing record included no evidence whatever regarding minors.[33] To the contrary, the statistical material submitted to the wage boards and the evidence before the commission dealt in part with employment and pay problems peculiar to students and trainees. Claimed lack of evidence relative to minors' subsistence needs rests on the assumption that the subsistence needs of female workers are irrelevant. Within broad limits, such compilations as Minnie's Budget are useful to determine the minimal needs of any single person. Order 8-68 (applicable to crop processing off the farm) fixes a $1.65 minimum rate for both women and minors. Order 13-68 (on-farm crop processing) permits a proportion of "learners" and minors at a $1.35 minimum, while Order 14-68, applicable to agricultural occupations, specifies a $1.35 minimum for minors of 16 and 17. These differentiations demonstrate careful inquiry and treatment following accumulation of adequate evidence.

The body of evidence before the commission included Minnie's Budget, a carefully conceived and conducted study of the total annual income need of a self-supporting woman living at a fairly drab, even austere, level of existence. According to June 1967 price levels, that total income need stood at $3,132.56. The concept underlying Minnie's Budget corresponded closely to the adequate living wage standard fixed by Labor Code section 1182, subdivision (a).[34] The commission heard testimony urging inadequacies in Minnie's Budget,

---

[33] The commission's wage orders define "minors" as those under the age of 18. See Labor Code, section 1172.

[34] In the explanatory portion (p. 7) of Minnie's Budget, the Division of Labor Statistics and Research stated: "The allowances are intended to permit a working woman, entirely dependent on her own resources and

testimony advocating $2 as a desirable hourly minimum, as well as testimony that employers in many industries, including agriculture, could stand no increase over existing levels. For a fully employed person, the $1.65 minimum selected by the commission would produce gross earnings at or barely above the subsistence level (for example, $3,300 per year for 40 hours per week, 50 weeks per year; or $1,815 per year for a woman employed for the 1,100 hours assumedly averaged by agricultural workers). Thus the hourly rate, like Minnie's total annual needs, corresponded closely to the statute. The $1.65 rate was thus justified as one applicable to California industry generally. The commission chose, as a matter of policy, to impose minimum rate parity between industry and agriculture. It fixed a rate 30¢ lower for minor farm workers, perhaps in recognition of lesser productivity, certainly in recognition that self-support is a relatively infrequent characteristic of this class of worker. The parties attacking these determinations have not met the burden of demonstrating arbitrariness, lack of supporting evidence, or violation of statutory standards.

## VALIDITY OF OVERTIME RATES

Orders 8-68 and 13-68, covering packing and processing of crops on and off the farm, prohibit employment of women beyond 8 hours per day or more than 6 days per week except in an emergency or when necessary to process a perishable product to prevent spoiling; and, as to permitted overtime, establish a premium rate one and one-half times the regular hourly rate for work in excess of 8 hours per day and 40 hours per week.[35]

 Real parties in interest make several attacks against these overtime regulations. One claim is lack of statutory authority. The claim is premised upon the proposition that, since premium pay for overtime is calculated upon the regular and not the minimum hourly rate, it affects women employed

supporting no dependents, to maintain a minimum but adequate mode of living.''

The brief filed by the Attorney General points out that Minnie has no dependents, shares a furnished apartment with another working woman, lives within the public transportation zone in which she works, has no wristwatch and no telephone, does not drink or smoke, never attends a theater, never eats dinner at a restaurant and spends $66 for a one-week vacation, including round trip transportation.

[35]The overtime provision of Orders 8-68 and 13-68 reads in part as follows: "(a) Unless otherwise provided by statute, no woman eighteen (18) years of age or over shall be employed more than eight (8) hours in any one day nor more than five (5) days in any one week unless the

at rates above the minimum. Labor Code section 1182 empowers the Industrial Welfare Commission not only to establish minimum wages, but also (in subdivision (b)) to establish maximum hours of work and in subdivision (c)) standard conditions of labor demanded by the health and welfare of women and minors. These three areas of authority are not mutually exclusive. The commission may, for example, regulate a condition of labor even though it affects wages above the minimum.[36] The imposition of a premium rate for overtime work discourages overtime employment by making it more expensive for the employer. It rests upon the commission's authority to regulate maximum hours and labor conditions and does not rest upon the commission's minimum wage authority. A comparable holding under the Fair Labor Standards Act occurs in *Bumpus* v. *Continental Baking Co.* (6th Cir. 1941) 124 F.2d 549, 551 [140 A.L.R. 1258], cert. den. 316 U. S. 704 [86 L.Ed. 1772, 62 S.Ct. 1305].

Next, it is urged that the overtime provisions of the commission's orders conflict with Labor Code sections 1350-1356. With qualifications, the latter fix a maximum 8-hour day, 48-hour week, for women in specified industries and trades. For present purposes these may be assumed to include agricultural packing operations. These provisions originated in 1911 and, since 1913, have coexisted with the statutes investing the Industrial Welfare Commission with regulatory powers as to women and minors. Each set of statutes contains a provision designed to dovetail with the other. Thus section 1182, subdivision (b), declares that the maximum hours fixed by the commission "shall not be more than the maximum now or hereafter fixed by law." The statutes restricting overtime of women contain a provision, added in 1967, which limits the regulatory powers of the commission in some respects.[37]

A group of exclusions from the statutory overtime limit is

employee receives one and one-half (1½) times her regular rate of pay for all work over forty (40) hours on the sixth (6th) day. Employment beyond eight (8) hours in any one day or more than six (6) days in any one week is permissible only under the following conditions:

"(1) During an emergency or when it is necessary to process a perishable product to prevent spoiling, if overtime employment is not prohibited by Labor Code Sections 1350-1356. . . ."

[36]*Kerr's Catering Service* v. *Department of Industrial Relations* (1962) 57 Cal.2d 319, 330 [19 Cal.Rptr. 492, 369 P.2d 20].

[37]Labor Code, section 1356: "The Division of Industrial Welfare shall enforce this article; provided, however, that neither the division nor the Industrial Welfare Commission may place on employers any limitations that are more restrictive than the provisions of this article."

listed in Labor Code section 1352. This group includes "the harvesting, curing, canning, packing, or drying of any variety of perishable fruit, fish, or vegetable during the periods when it is necessary . . . to prevent spoiling." Exceptions also appear in section 1350.5, a provision designed to harmonize with the Fair Labor Standards Act and to permit employers subject to that act to employ women up to the weekly time limitations permitted by that act, but at premium rates for overtime.[38] Since, however, section 7 of the Fair Labor Standards Act (29 U.S.C.A., § 207) withdraws much of that act's overtime protection from employees in seasonal processing or canning of perishable crops, section 1350.5, subdivision (b) (2) of the state law excludes these employees from the exemption conferred by section 1350.5, subdivision (a). The net effect is to subject these seasonal employees to the general provisions of the state law. (See 50 Ops. Cal. Atty. Gen. 141, 147-148 (1967).)

By means of section 1352, the California 8-hour law limiting women workers' overtime excludes coverage of overtime which occurs in the course of processing perishable crops "when necessary . . . to prevent spoiling."[39] The Industrial

[38]Labor Code, section 1350.5: "(a) Employers of employees covered under the provisions of the Fair Labor Standards Act may employ females up to 10 hours during any one day of 24 hours or up to 58 hours in one week, provided that they are compensated at the rate of 1½ times the regular rate of pay for time worked for one employer in excess of eight hours in any one day or 40 hours in any one week.

"(b) The provisions of subdivision (a) shall not apply to: (1) employers whose employees are exempted in Section 13 of the Fair Labor Standards Act, as amended through February 1, 1967, from the provisions of Section 7 of the Fair Labor Standards Act; (2) employers whose employees are exempted in Section 7 of the Fair Labor Standards Act, as amended through February 1, 1967, from the provisions of Section 7 of the Fair Labor Standards Act, if the employees are not entitled under such exemptions in Section 7 to 1½ times their regular rate of pay until they have worked more than 48 hours in one week; and (3) employers whose employees are engaged in the laundering, cleaning, or repairing of clothing, or in the clothing manufacturing industries.

"(c) The provisions of subdivisions (a) and (b) of this section shall not affect or change the provisions of any existing collective bargaining agreement.

"(d) Notwithstanding the provisions of subdivision (b) of this section, the provisions of subdivision (a) of this section shall apply to the employment of females by airlines certificated by the federal or state government."

[39]The material before us does not permit a precise view of the scope of this exclusion. For present purposes, it seems appropriate to assume that the preparation and packing of perishable crops during the harvest must be conducted as a continuous process, thus that the clause "when necessary . . . to prevent spoiling" has general rather than emergency application to the seasonal processing of perishable crops in preparation for shipping. (See *In re Miller* (1912) 162 Cal. 687, 700 [124 P. 427].)

Welfare Commission orders, on the other hand, permit such overtime only at a premium rate of pay. There is no conflict between the statutory exclusion and the commission orders. The exclusion in section 1352 is not designed to guarantee employers the right to demand overtime without limit. It recognizes that the 8-hour limit is not appropriate to the needs of packing establishments handling perishables. On the other hand, the statutes authorizing Industrial Welfare Commission regulation of maximum hours and labor conditions implicitly recognize the harmful possibilities of unlimited overtime. There is no inconsistency between recognition of the employers' needs and awareness of the employees' risks. Since section 1352 does not guarantee overtime privileges but only excludes overtime from the prohibition, the overtime inhibitions in the commission orders do not conflict with it.

By parity of reasoning, the overtime premium imposed by the commission is not more restrictive than the statutory limitations on overtime for women (Lab. Code, § 1356, fn. 37, *supra*), since it operates in an area excluded from those limitations. The predecessors of Orders 8-68 and 13-68 have imposed premium overtime rates for women and minors ever since 1919. This long-continued and consistent administrative interpretation has received at least silent acquiescence from the Legislature. It supports the interpretation that the statutory restrictions on overtime should not be construed to prevent it. The courts will not depart from such an administrative construction unless it is clearly erroneous or unauthorized.[40]

Where the circumstances do not call for overtime to prevent spoilage of perishables, the commission's regulatory action is consistent with the statutory limitation, since both prohibit overtime under such circumstances without regard to pay rates. Out of circumspection, the wage order provisions on overtime (fn. 35, *supra*) are preceded by the phrase "unless otherwise provided by statute" and declare that its premium rates are applicable only to overtime permitted by Labor Code sections 1350-1356. The claim of conflict has no merit.

Another attack is grounded on the contention that, since the enactment of section 1350.5 in 1967, California law unconstitutionally discriminates between two classes of female workers: those working on interstate products who are covered by the Fair Labor Standards Act, hence have the opportunity

[40]*Select Base Materials Inc.* v. *Board of Equalization* (1959) 51 Cal.2d 640, 647 [335 P.2d 672].

of working up to 58 hours per week at premium rates for hours above 40 and those not working on interstate products and not within the coverage of the federal law who are denied that opportunity. The claim is irrelevant for three reasons: (1) The premium pay provisions of the Industrial Welfare Commission's orders apply to permitted and not prohibited overtime. (2) The claim is an attack on the validity of Labor Code sections 1350-1356, while the issue here is the validity of regulations issued under sections 1171-1204. (3) The claim is made by employers who, by the very terms of the Fair Labor Standards Act (29 U.S.C.A., § 218), are subject to the more stringent demands of state law, hence are outside the class of allegedly injured employees.[41]

### FEDERAL PREEMPTION AND CONFLICT WITH FEDERAL LAW.

Real parties in interest contend that an array of federal statutes form a comprehensive plan of national regulation, preempting the field of wage and hour legislation and excluding state regulations such as Orders 8-68, 13-68 and 14-68 of the Industrial Welfare Commission. They refer to the following statutes as components of the federal regulatory plan: the National Labor Relations Act, 29 U.S.C.A., § 151; the Railway Labor Act, 45 U.S.C.A., § 151; the Fair Labor Standards Act of 1938, 29 U.S.C.A., § 201; the Wagner-Peyser Act, 29 U.S.C.A., § 49; and title 7 of the Civil Rights Act, 42 U.S.C.A., § 2000e.

State regulation of wages, hours and working conditions, particularly affecting women and minors, has been such a widely and long-established feature of American life that this argument comes as a distinct surprise.[42] Doubtless it would arouse equal surprise in the halls of the federal Congress. Preemption is primarily a matter of congressional intent.[43]

---

[41]See *Fox-Woodsum Lbr. Co.* v. *Bank of America etc. Assn.* (1936) 7 Cal.2d 14, 22 [59 P.2d 1019].

[42]Twenty-eight states and the District of Columbia have laws establishing a statutory minimum wage. Statutory provisions for the adoption of minimum wage orders by administrative boards exist in 19 states and the District of Columbia. (See Commerce Clearing House, Labor Law Reporter, State Laws, vol. 1, par. 40355.) In 1963, the President's Commission on the Status of Women reported that all but seven states had maximum work hour limitations for women (Report, *American Women* (1963) *supra*, p. 36.)

[43]*San Diego Bldg. Trades Council* v. *Garmon* (1959) 359 U.S. 236, 239-240 [3 L.Ed.2d 775, 779-780, 79 S.Ct. 773]; *Loma Portal Civic Club* v. *American Airlines, Inc.* (1964) 61 Cal.2d 582, 591-592 [39 Cal.Rptr. 708, 394 P.2d 548].

While not all the components of the "comprehensive" federal plan contain noninterference or saving clauses, several such clauses are so prominent as to foreclose any possibility of misapprehensions touching congressional intent. One such clause, which has been a part of the Fair Labor Standards Act ever since its enactment in 1938, declares (29 U.S.C.A., § 218): "No provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter or a maximum workweek lower than the maximum workweek established under this chapter. . . ."[44] Another was enacted as part of the Civil Rights Act of 1964. (Public Law 88-352 [78 Stat. 253, 42 U.S.C.A., § 2000e et seq.) A basic provision of that law prohibits employers from indulging in "unlawful employment practices" by discriminating against employees because of race, color, religion, sex or national origin. (42 U.S.C.A., § 2000e-2.) It carries a clause evincing a purpose to shelter consistent obligations owed under state law (42 U.S.C.A., § 2000e-7): "Nothing in this subchapter shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter."

The fact of the matter is that the coverage of the Fair Labor Standards Act does not extend to farms below the 500 man-day employment level (fn. 44, *supra*) and, as to farms above that level, expresses a "hands off" attitude when state law fixes a shorter workweek or specifies a rate higher than the federal minima of $1 to $1.30 per hour.

---

[44]In connection with the saving clause, it is interesting to note that the Fair Labor Standards Amendments of 1966 (Pub. L. 89-601 [80 Stat. 841] eff. 2/1/67) extended federal minimum wage standards to agricultural employees on farms employing more than 500 man-days of agricultural labor in a calendar quarter (29 U.S.C.A., § 213, subd. (a)(6)) as well as certain workers in agricultural processing (Pub. L. 89-601, § 204, repealing 29 U.S.C.A. § 213(a)(10)). The Amendments (§ 302) set the hourly minimum wage of agricultural employees at $1 during the year commencing February 1, 1967, at $1.15 during the following year, and $1.30 thereafter (29 U.S.C.A., § 206(a)(5)), the same minima as those fixed for nonagricultural workers during those particular years (the latter, however, progressing to a $1.60 rate in 1971). In presenting the bill the Senate Labor and Public Welfare Committee voiced the objective of achieving ultimate parity between farm and nonfarm employees. (Senate Report No. 1487, Aug. 23, 1966, 1966 U.S. Code, Congressional and Administrative News, pp. 3011, 3021.)

The contention that the National Labor Relations Act forms one of the components of a "comprehensive federal plan" designed to oust state regulation flies in the face of contrary judicial declarations.[45]

Counsel support the preemption argument by decisions supposedly finding preemption in the face of saving clauses. The argument employs the phrase "saving clause" as an indiscriminate cachet. In each of the three cited cases, the court held that that particular congressional references to state power or jurisdiction did not manifest an intent to preserve state regulation.[46] In none did the court find preemption contrary to an express congressional declaration.

A specific regulation of the Industrial Welfare Commission may enter a relatively narrow regulatory sphere reserved by Congress or may actually conflict with a federal regulation. (See, for example, *United Air Lines, Inc.* v. *Industrial Welfare Com., supra,* 211 Cal.App.2d 729.) Indeed, conflict is charged here, that is, by establishing minimum pay and working conditions of women and not men, California indulges in a discriminatory employment practice prohibited by the Federal Civil Rights Act, *supra.* One group of real parties in interest contends that the Industrial Welfare Commission orders result in discrimination against women by inducing employers to hire men at less pay. Other real parties in interest argue that the orders discriminate against men by confining their protection to women (and minors). One is tempted to rejoin that a state regulation which discriminates against both sexes discriminates against neither.

There is nothing in the history of the Federal Civil Rights Act indicative of congressional intent to abrogate state legislation fixing minimum pay and working conditions for women. The state legislation does not sanction discrimination between the sexes, and there is no evidence that such is its effect. The federal act permits hiring selection based upon a "bona fide occupational qualification" necessary to the normal operation of the enterprise. (42 U.S.C.A., § 2000e-2, subd.

[45]See *San Diego Bldg. Trades Council* v. *Garmon, supra,* 359 U.S. at pp. 239-240 [3 L.Ed.2d at pp. 779-780]; *Weber* v. *Anheuser-Busch* (1955) 348 U.S. 468, 480-481 [99 L.Ed. 546, 557-558, 75 S.Ct. 480]; *Grunwald-Marx, Inc.* v. *Los Angeles Joint Board* (1959) 52 Cal.2d 568, 577-588 [343 P.2d 23].

[46]*Federal Power Com.* v. *Southern Cal. Edison Co.* (1964) 376 U.S. 205, 216-218 [11 L.Ed.2d 638, 646-648, 84 S.Ct. 644]; *Pennsylvania* v. *Nelson* (1956) 350 U.S. 497, 501-502 [100 L.Ed. 640, 651-652, 78 S.Ct. 477]; *First Iowa Hydro-Elec. Coop.* v. *Federal Power Com.* (1946) 328 U.S. 152, 175-178 [90 L.Ed. 1143, 1155-1157, 66 S.Ct. 906].

(e).) As we interpret this provision, the absence of state-imposed minimal standards for male employees is not a bona fide occupational qualification which would permit an employer to hire male applicants and reject females. Since federal law would require the employer to accept or reject both sexes without regard to state-imposed minimal standards for one, the state law deprives neither sex of equal job opportunities. In terms of equal pay and working conditions, the state law and regulations neither require nor permit employers to maintain men at conditions inferior to those of women. Whether the federal Civil Rights Act or federal equal pay statute (29 U.S.C.A., § 206, subd. (d)) requires employers to bring male employees up to the minimum standards which state law fixes for females, is an interpretive and enforcement problem for the federal agencies, one which is not before us in this proceeding.[47] As a practical matter, the minimal conditions provided for women tend to become a common floor for all. That employers will or may in practice employ male workers at inferior conditions is at best a speculation. We find no enforced discrimination between the sexes arising from state law, hence no conflict with federal anti-discrimination legislation.

## The Relief to Be Granted.

The orders adopted by the Industrial Welfare Commission on September 26, 1967, are valid, and the Division of Industrial Welfare is under a statutory duty to enforce them. (Lab. Code, § 1193.5.) The petitioning employees are entitled to a writ of mandate to compel performance of this duty. (Code Civ. Proc., § 1085.) The division, however, is the object of restraints embodied in the alternative writs of mandate issued in the Los Angeles and San Francisco Superior Court actions. These alternative writs have never been discharged. In these three lawsuits the superior courts had jurisdiction to determine their own jurisdiction, but went farther and indulged in positive assumptions of jurisdiction by issuing restraints

[47]See Regulations, U.S. Dept. of Labor, under Equal Pay Act of 1963 (Pub. L. 88-38 [77 Stat. 56, 29 C.F.R., § 800.161]); Equal Employment Opportunity Commission, Guidelines on Discrimination Because of Sex, 29 C.F.R., § 1604.1; see also Murray and Eastwood, *Jane Crow and the Law* (1965) 34 Geo. Wash.L.Rev. 232, 249-250; Miller, *Sex Discrimination and Title VII of the Civil Rights Act of 1964* (1967) 51 Minn. L.Rev. 877, 894-896; cf. *Reynolds* v. *Mountain States Tel. & Tel. Co.* (1966) Case No. 17-12E, Ariz. Civil Rights Commission, C.C.H. Labor Law Reports, Employment Practices Guide, ¶8111. Labor Code section 1197.5, a recently enacted state equal pay law, should also be noted.

against the administrative agency. Because they assumed to prohibit the enforcement of valid actions of the agency, these restraints were in excess of jurisdiction in the sense that they became subject to correction by an appropriate prerogative writ. (*Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 291, 302-303 [109 P.2d 942, 132 A.L.R. 715] ; see also *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 454-455 [20 Cal.Rptr. 321, 369 P.2d 937].)

At times appellate courts have issued writs of mandate directing administrative action which lower courts had restrained, implying but not expressing supersedure of the latters' orders.[48] Whatever may be appropriate in other cases, it is inappropriate here that the enforcement agency be burdened with any doubt emanating from nominally conflicting judicial orders. This court has authority to grant any appropriate relief within the issues presented by the pleadings.[49] In order to assure complete realization of the relief to which petitioners are entitled, this court will issue a writ of mandate addressed to the superior courts as well as the enforcement agency. In this exercise of original jurisdiction, this court is not constrained by the fact that neither court is within our appellate district.[50]

Let a peremptory writ of mandate issue directing the Division of Industrial Welfare of the State Department of Industrial Relations to enforce Orders 8-68, 13-68 and 14-68 adopted by the Industrial Welfare Commission on September 26, 1967; directing the Superior Court in and for the City and County of San Francisco to vacate those provisions of the alternative writs of mandate issued in actions Nos. 587891 and 587878 which stayed enforcement of said orders and directing the Superior Court in and for Los Angeles County to vacate a like provision in the alternative writ of mandate issued in action No. 925929.

Pierce, P. J., and Regan, J., concurred.

Petitions for a rehearing were denied October 9, 1968, and the petitions of the real parties in interest for a hearing by the Supreme Court were denied October 31, 1968.

---

[48]See, e.g., *Pitts* v. *Perluss, supra,* 58 Cal.2d at p. 848; *Perry* v. *Jordan, supra,* 34 Cal.2d at p. 95.

[49]*Caminetti* v. *Superior Court* (1941) 16 Cal.2d 838, 848 [108 P.2d 911].

[50]*In re Davidson, supra,* 167 Cal. at p. 728.