[Civ. No. 19582. Fourth Dist., Div. Two. July 24, 1980.]

CALIFORNIA MANUFACTURERS ASSOCIATION,
Plaintiff and Appellant, v.
INDUSTRIAL WELFARE COMMISSION et al.,
Defendants and Appellants.

98

**COUNSEL**

Gibson, Dunn & Crutcher, Willard Z. Carr, Jr., Kenneth E. Ristau, Jr., and Dennis A. Gladwell for Plaintiff and Appellant.

Kahn & Farley, Jan L. Kahn, Mitchell, Silberberg & Knupp, Richard M. Mosk, Brobeck, Phleger & Harrison, Jean C. Gaskill, James L. Meeder, Littler, Mendelson, Fastiff & Tichy, Robert F. Millman, Lloyd W. Aubry, Jr., and Richard W. Smith as Amici Curiae on behalf of Plaintiff and Appellant.

Evelle J. Younger and George Deukmejian, Attorneys General, and Melvin R. Segal, Deputy Attorney General, for Defendants and Appellants.

Christine C. Curtis and Peter H. Weiner as Amici Curiae on behalf of Defendants and Appellants.

**OPINION**

**MORRIS, J.**—The California Manufacturers Association (association), representing more than 500 private employers, appeals from a judgment denying association's petition for a writ of mandate by which it sought to invalidate four orders of the Industrial Welfare Commission (commission). The challenged orders regulate the wages, hours, and conditions of employment in the following industries: Order 1-76 regulates the manufacturing industry; order 3-76 regulates the canning, freezing, and preserving industry; order 4-76 regulates professional, technical,

clerical, mechanical, and similar occupations; and order 8-76 regulates industries handling products after harvest.

The association seeks to invalidate the aforesaid orders, contending that: (1) the commission failed to conduct the investigation required by Labor Code section 1178 prior to establishing the wage boards; (2) the orders do not include adequate statements of basis as required by Labor Code section 1177; (3) the orders are preempted by the National Labor Relations Act and federal labor law, except as to minimum wages; (4) the commission failed to consult with California Occupational Safety and Health Standards Board (Cal/OSHA) as required by Labor Code section 1173, and regulated in areas in which Cal/OSHA has exclusive jurisdiction; (5) the commission failed to comply with the California Environmental Quality Control Act; and (6) the commission's failure to treat all collective bargaining agreements equally constitutes a denial of equal protection of the law.

## I. INVESTIGATION

When this appeal was first heard, this court held that the commission had failed to conduct the investigation required by Labor Code section 1178[1] prior to calling the wage boards to consider wages, hours, and working conditions, and the judgment upholding the order and denying the petition was reversed. The California Supreme Court granted a hearing.

Thereafter, the Supreme Court decided *California Hotel & Motel Assn. v. Industrial Welfare Com.* (1979) 25 Cal.3d 200 [157 Cal.Rptr. 840, 599 P.2d 31], in which the court considered the validity of order 5-76, relating to the public housekeeping industry, which had been issued at the same time as the orders considered herein and as a result of similar proceedings. Subsequent to the issuance of its opinion in *California Hotel & Motel Assn.*, the Supreme Court retransferred this cause to this court for reconsideration in the light of that opinion.

In *California Hotel & Motel Assn.* the court examined the commission's duty under section 1178 in the light of the history of the commission's statutory authority and concluded as follows: "In summary, the Legislature extended the authority of the commission to determine the wages, hours, and working conditions of all employees,

---

[1]All statutory references are to the Labor Code unless otherwise stated.

men as well as women and minors, except outside salesmen. But before the commission could update, extend, change, amend, repeal, or othewise modify its previous orders, rules, regulations, or policies, which covered only women and minors, to exercise its extended authority, the Legislature required the commission to undertake a full review of such orders, rules, regulations, or policies. The Legislature perceived an urgent need for the commission to do so 'forthwith.' *These three legislative pronouncements together relieved the commission, in the present instance, of meeting any separate requirement under section 1178 that the commission 'investigate and find' that wages, hours, or working conditions were inadequate or prejudicial.* Order 5-76 is the product of the 1973-1974 mandate in section 1173.[17] The commission did not promulgate the order in violation of section 1178." (*California Hotel & Motel Assn.* v. *Industrial Welfare Com., supra,* 25 Cal.3d 200, 209. Italics added.)

Orders 1-76, 3-76, 4-76 and 8-76 were also adopted pursuant to the 1973-1974 legislative mandate. Therefore, the Supreme Court's decision resolves the investigation issue before this court in favor of the sufficiency of the investigation for purposes of these orders. The association asks this court to issue an advisory opinion to provide guidance on the issue of what constitutes a proper section 1178 investigation for future orders. This we decline to do.

## II. STATEMENTS OF BASIS

*California Hotel & Motel Assn.* also provides some guidance for the determination of the adequacy of the statements of basis pursuant to section 1177, which provides that "Each order of the commission shall include a statement as to the basis upon which the order is predicated and shall be concurred in by a majority of the commissioners."

In *California Hotel & Motel Assn.* the Supreme Court held that the statements of basis initially promulgated by the commission with respect to its 1976 orders were inadequate under section 1177. The court outlined the purposes of the statement of basis and defined the standard by which a statement of basis is to be judged. The judgment was reversed with directions to the trial court to issue a writ of mandate

---

"[17]An earlier Order 5-74 issued in March of 1974 was invalidated by a superior court. (See *Henning* v. *Industrial Welfare Commission* (1975) 76 Lab. Cas. (CCH) 71, 159, [¶] 53, p. 639; 22 Wage & Hour Cases 225 (S.F. Super. Ct., No. 674671).)"

compelling the commission to take further action consistent with the opinion, within 120 days of the finality of the opinion. In order to preserve the status quo, the court ordered that order 5-76 should remain operative "pending correction of deficiencies" in the statement of basis. (*California Hotel & Motel Assn.* v. *Industrial Welfare Com., supra*, 25 Cal.3d 200, 215-216.)

With respect to the orders which are the subject of the instant proceeding, the trial court initially held that the statements of basis were inadequate. However, instead of issuing a writ of mandate invalidating the orders, the court retained jurisdiction and sent the matter back to the commission with directions to prepare and submit new statements of basis.[2] Otherwise, the trial court denied the relief sought under the association's petition for writ of mandate.

In obedience to the court's directive, the commission issued new statements of basis on April 29, 1977, with respect to these orders. The trial court determined that the new statements of basis were adequate and complied with section 1177, except for section 16 (relating to elevators) of each order. The petition for writ of mandate was denied except as to section 16, as to which the petition was granted, and the commission was ordered to vacate and rescind section 16 of each of the four orders.

We now examine the new statements of basis, applying the standard enunciated by the Supreme Court in *California Hotel & Motel Assn.*

The Supreme Court noted in *California Hotel & Motel Assn.* that a statement of basis serves several functions. It satisfies the legislative mandate; it facilitates meaningful judicial review; it subjects the agency action to more informed scrutiny by the Legislature, the regulated public, and others; it induces agency action that is reasonable, rather than arbitrary or capricious; it introduces an element of predictability into the administrative process; and it stimulates public confidence by promoting the reality and appearance of rational decision making. (*California Hotel & Motel Assn.* v. *Industrial Welfare Com., supra*, 25 Cal.3d 200, 210-211.)

---

[2]The procedure followed by the trial court in effect anticipated the procedure later adopted by the Supreme Court in *California Hotel & Motel Assn.*, to wit, the preparation of new statements of basis by the commission to support the orders already promulgated.

Because the commission exercises a legislative function in promulgating its orders, the courts exercise a limited review. ■ However, "Although administrative actions enjoy a presumption of regularity, this presumption does not immunize agency action from effective judicial review. ■ A reviewing court will ask three questions: first, did the agency act within the scope of its delegated authority; second, did the agency employ fair procedures; and third, was the agency action reasonable. Under the third inquiry, a reviewing court will not substitute its independent policy judgment for that of the agency on the basis of an independent trial de novo. A court will uphold the agency action unless the action is arbitrary, capricious, or lacking in evidentiary support. [Fns. omitted]." (*Id.*, at p. 212.)

In light of these considerations, the Supreme Court defined the standard by which to evaluate the statement of basis required by section 1177, as follows:

(1) The statement should reflect the factual, legal, and policy foundations for the action taken; (2) it must show that the order adopted is reasonably supported by the material gathered by or presented to the commission—through its own investigations, the wage board proceedings, and the public hearings—and (3) it must show that it is reasonably related to the purposes of the enabling statute. (*California Hotel & Motel Assn.* v. *Industrial Welfare Com., supra*, 25 Cal.3d 200, 213.)

The statement of basis is not the equivalent of findings of fact; it is simply an explanation of how and why the commission did what it did. (*Ibid.*)

"If terms of the order turn on factual issues, the statement must demonstrate reasonable support in the administrative record for the factual determination. If, on the other hand, the terms of the order turn on policy choices, an assessment of risks or alternatives, or predictions of economic or social consequences, the statement of basis must show how the commission resolved conflicting interests and how that resolution led to the order chosen. If an order differentiates among classes of industries, employers, or employees, the statement of basis must show that the distinctions drawn are reasonably supported by the administrative record and are reasonably related to the purposes of the enabling statute." (*Id.*, at p. 214.)

The association's attack on the statements of basis is essentially directed at two general aspects of the statements, namely, (a) the statements do not contain an analysis of the commission's "own investigation" of working conditions in 1974, 1975 or 1976, including investigation of the particular problems of each industry separately; and (b) the statements do not show how the orders are "demanded" by the health and welfare of male employees.

## A. *The Commission's "Own Investigation"*

The contentions directed at the commission's failure to set forth findings based upon its "own investigation" is an attempt to relitigate the issue resolved in *California Hotel & Motel Assn.* The Supreme Court held that the effect of the legislative mandate extending the authority of the commission to determine the wages, hours, and working conditions to men (§ 1171), and requiring a full review of all existing rules and regulations, and policies prior to extensions (§ 1173) was to relieve the commission, with respect to the 1976 orders, of meeting any separate requirement under section 1178 that the commission "investigate and find" that wages, hours or working conditions were inadequate or prejudicial. (*California Hotel & Motel Assn.* v. *Industrial Welfare Com., supra,* 25 Cal.3d 200, 209.)

The commission, having been relieved of the obligation of meeting any separate requirement, under section 1178, that the commission "investigate and find" that wages, hours, or working conditions were inadequate or prejudicial, may not then be required to set forth findings based upon such a separate investigation.

## B. *Orders "Demanded" by Health and Welfare of Male Employees*

 The association's contentions directed at the failure of the statements to show how the orders are "demanded" by the health and welfare of male employees ignore the historical development of the commission and the provisions of section 1171, extending the commission's authority to include men, and section 1173, requiring the commission to undertake a full review and to update its "rules, regulations, and policies to the extent found by the commission to be necessary to provide adequate and reasonable wages, hours, and working conditions appropriate for *all employees in the modern society.*" (Italics added.)

It seems obvious in the light of the legislative history that this mandate imposed upon the commission the primary obligation to make a policy decision to either extend protections to men or eliminate them for women.

Clearly, the legislation did not preclude the commission's consideration of any evidence produced at the hearings that might affect the policy determination, or change the previous determination regarding the factual foundation for the order. However, the factual burden of demonstrating that prior protections are no longer appropriate for employees in a modern society should be on the party who contends that conditions have changed.

We turn again to the standard set forth by the Supreme Court for the evaluation of the statement of basis required by section 1177. Where the terms of the order turn on policy choices the statement of basis would be somewhat different from a statement supporting an order based primarily on a new factual determination. "If terms of the order turn on factual issues, the statement must demonstrate reasonable support in the administrative record for the factual determinations. *If, on the other hand, the terms of the order turn on policy choices, an assessment of risks or alternatives, or predictions of economic or social consequences, the statement of basis must show how the commission resolved conflicting interests and how that resolution* led to the order chosen." (*California Hotel & Motel Assn.* v. *Industrial Welfare Com., supra,* 25 Cal.3d 200, 214. Italics added.)

The statements of basis which are the subject of this proceeding emphasize that to a substantial degree the terms of the orders did turn on a policy choice, i.e., whether to extend existing protections to include men or to eliminate the protections heretofore found necessary for women.

This was necessarily so because the Civil Rights Act of 1964 (42 U.S.C.A. § 2000e-2) requires equal treatment of men and women. The congressional purpose was to eliminate subjective assumptions and traditional stereotyped conceptions regarding the ability of women to do particular work. (See *Weeks* v. *Southern Bell Telephone & Telegraph Company* (5th Cir. 1969) 408 F.2d 228; *Rosenfeld* v. *Southern Pacific Company* (9th Cir. 1971) 444 F.2d 1219.) Difference in treatment between men and women, including protective legislation of the type here

in issue, not based upon bona fide occupational qualifications constitutes unlawful discrimination. Moreover, exceptions based upon sex in measuring job capacity are to be narrowly construed, and the burden of proving facts to support an exception is on the proponent. (*Bujel* v. *Borman Food Stores, Inc.* (E.D.Mich. 1974) 384 F.Supp. 141; *Rosenfeld* v. *Southern Pacific Company, supra,* 444 F.2d 1219.)

In view of this fundamental change in the law, the association's contention that the statements fail to explain the need for the orders in terms of working conditions in 1974, 1975 or 1976, but instead, rely on what the commission "found" in previous years has no merit. With respect to the commission's use of the language that it "continues to find" certain facts or conditions to exist, the trial court determined that such a finding is consistent with there having been a full review, in that the review may well reflect that those facts and conditions have not changed since the previous orders. We agree. The mere fact that the commission continued to find a fact or condition to exist, rather than finding it for the first time, does not invalidate the factual basis for the order. Absent a showing of a bona fide basis for discriminating between men and women, or that the health and welfare of women no longer demand the standard conditions contained in the order, the commission could justifiably resolve the conflicting interests by extending the terms of the order to apply to men.

The association argues that the statements fail to concern themselves with the particular problems of each industry separately, because each of the four statements of basis are identical. As the superior court noted, this is because in the particulars in which the statements of basis are identical, so are the orders. The repetitiveness of the orders appears to be the result of the fact that, in the absence of grounds for distinction, fairness and equal treatment require the same regulations for all industries with respect to basic conditions of employment. In the absence of grounds for different treatment, the material that supports an order in one industry may well support an identical order in another different industry. The issue under the *California Hotel & Motel Assn.* test is whether the statement shows that the order is reasonably supported by the material gathered by or presented to the commission, and that it is reasonably related to the statutory purpose. Moreover, the association has failed to point to any differences in the industries that would require different treatment in any area with respect to which the commission has not differentiated.

We now turn to a consideration of specific sections of the statements as to which the association contends the statements are inadequate.

*1. Section 1—Applicability.*

 The substance of this section is that the order shall apply to men as well as women and children, except for listed exceptions.

The association objects to this portion of the statements on the ground that it does not describe evidence that proves that the health and welfare of male employees demand that they be included in the standard conditions of labor contained in the order.

The trial court correctly stated that this objection should be directed at specific conditions rather than to general applicability. Surely as to general applicability it is sufficient to state the legal necessity for including men in the commission's order. (See Civil Rights Act of 1964 (42 U.S.C.A. § 2000e-2); *Rosenfeld v. Southern Pacific Company, supra*, 444 F.2d 1219.)

Moreover, in examining specific conditions, a threshold principle must be observed: By reason of the Civil Rights Act of 1964, women are now on an equal footing with men. (See *Rosenfeld v. Southern Pacific Company, supra*, 444 F.2d 1219; *Bujel v. Borman Food Stores, Inc., supra*, 384 F.Supp. 141.) Because of this fundamental change in the law, there is justification for including men in the orders without a separate finding that the health and welfare of just male employees require it. That justification is to insure that women would continue to be protected where the statement reflects the factual basis that the health and welfare of women employees require it.

The statements are sufficient to show how the commission resolved conflicting interests by extending standards in existing orders, as opposed to dilution or removal of orders where those orders are found necessary for the protection of women employees.

*2. Section 3—Hours and Days of Work.*

Section 3, subsection (A) provides that the maximum hours of work for adults shall be an 8-hour day, 40-hour week, with time and a half for overtime and for double time in special circumstances.

■ The association concedes that this section contains a fair explanation of why the commission has set maximum hour limitations with respect to women employees, but attacks the sufficiency of the statements with respect to males. In particular, the association asserts that the only explanation offered is that organized labor has come to consider any official extension of the eight-hour day as a retreat and an attack on the welfare of employees.

This is a misstatement. The statements go into great detail in setting forth the history of, and reasons for, the eight-hour day, and the reasons for the requirement for the payment of overtime premiums after eight hours a day and five days a week. The statements include the history of congressional action in this field. As to the provision for premium pay for overtime, the statements make it clear that such provision has become the primary device for enforcing limitation on the maximum hours of work. As the trial court observed, it is a legally approved means to a legally approved end. (See *Bunting* v. *Oregon* (1917) 243 U.S. 426 [61 L.Ed. 830, 37 S.Ct. 435].) The statements set forth the reasons supporting premium pay, to wit, it is a maximum hour enforcement device; a means of encouraging more employment; and a means of furnishing extra money to enable the employee to pay for services the employee would otherwise perform. (See *Bunting* v. *Oregon, supra*, 243 U.S. 426; and see other U.S. Supreme Court cases upholding overtime legislation collected in 48 Am.Jur.2d (1970) Labor and Labor Relations, § 1542, p. 958, fn. 10.)

The provision for premium pay for overtime is as reasonably applicable to men as to women and is a fair resolution of a policy question. Moreover, the association does not state any reason why the factual material does not support extension of these requirements to male employees.

Section 3, subsection (B) provides for a 4-day work week of not more than 10 hours per day under certain circumstances. This alternative is available only if two-thirds of the affected employees agree.

The association seems to approve of an alternative to the eight-hour day and five-day week minimum, but complains because the orders do not permit an infinite variety of alternatives, and contends that "[u]nless the Commission expressly finds that all other alternatives are not consistent with the health and welfare of employees, these alternatives should be equally available."

In making this argument, the association ignores the fact that *any* alternative is an exception. The basic determination that the health and welfare of employees require maximum hours of work, and that the eight-hour day, five-day week is consistent with that requirement has already been made, and the statements of basis provide a sufficient explanation of the commission's choice, and demonstrate reasonable support in the record for that determination. It was not necessary for the statements to explain why every conceivable alternative was not authorized; it was sufficient for the statements to demonstrate that the alternative which was selected was reasonable.

### 3. Section 5—Reporting Time Pay.

This section provides, with certain exceptions, that an employee who reports for work, but is given half or less of a day's work to do, shall be paid for at least a stated minimum number of hours. The statements go on to describe the opposing positions taken by employers and employees and others on the wage boards, and the basis for the commission's resolution of these opposing positions.

The association objects on the ground that the stated basis has no relationship to health considerations.

We agree with the trial court that the stated basis (encouraging proper notice and scheduling) is reasonably related to the welfare of the employees (both male and female) and thus to the purpose of the enabling statute. It is an appropriate device for enforcing proper scheduling consistent with maximum hours and minimum pay requirements.

### 4. Section 7—Records.

This section requires employers to keep certain records, and periodically to furnish employees with an itemized wage statement.

The statements note that most of the information is already required to be kept by section 1174 and set forth that requiring the employers to provide employees copies of certain of these records is reasonable and necessary for the employees' welfare.

The association appears to object on the ground that this requirement is not related to the employees' health or welfare.

The trial court found "that employee welfare does require that wage data be furnished...to help the employee in...dealings with the IRS and FTB [and] so that time disputes [between employer and employee] might be more readily resolved." Since this requirement can be viewed as a device for enforcing wage and hour requirements, we agree that the statements show this requirement to be reasonably related to the purposes of the enabling statute.

*5. Section 8—Cash Shortage and Breakage.*

This section states when an employee may be charged for cash shortage and breakage.

The statements describe the historical development of the section, explain the basis for imposing special accountability by employees having exclusive and personal control of cash, and conclude with the policy statement that the commission found it inappropriate for the employee to be made the insurer of the employer's normal business losses.

██ The association again objects that the reasons do not relate to health and welfare considerations. They clearly do. Surely the association does not suggest that it would be "consistent" with the employees' health or welfare to permit the employee to be charged for the normal shortages or breakages of the business, where the employee does not have a special duty with respect to control. Moreover, required reimbursements directly affect minimum wage provisions.

*6. Section 9—Uniforms and Equipment.*

This section states when an employer must furnish uniforms, tools and equipment and sets forth the historical basis.

██ The association objects to the extension to men on the ground that they had been used to furnishing their own uniforms.

The statements make it clear that this order is based upon the policy choice to extend the requirement to male employees, because a contrary provision would be discriminatory as to women who for years have been furnished with uniforms. Subsection B was amended to permit employers to require persons engaged in the crafts to provide their own tools, where that has been customary, on condition that their pay is adequate.

The statements adequately show how the commission resolved conflicting interests and how that resolution led to the orders chosen.

### 7. Section 10—Meals and Lodging.

■ The section states that when the employer and the employees have agreed in writing that meals and lodging shall be part of the wage, the value of the meals and lodging to be charged against the wage shall not exceed the amount specified in this section.

The statements describe the history of the section; show that the requirement of a written agreement is to comply with *California State Restaurant Assn.* v. *Whitlow* (1976) 58 Cal.App.3d 340, 347 [129 Cal.Rptr. 824];[3] state the conflicting positions and conclude "that meals and lodging are items of real value which employees may elect to accept in lieu of cash within protective limits"; and finally refer to the specific evidence relied on in computing the limits to be imposed.

This portion of the statements clearly reflects both the legal and factual basis for the action taken and is reasonably supported by the material presented.

### 8. Section 11—Meal Periods.

This section states the circumstances requiring the employer to provide at least a 30-minute meal period, when the meal period shall be included in the time worked, and when an eating place must be provided. The statements describe the history of the section commencing in 1916, that it has been substantially the same since 1947, and provide for exemptions under certain circumstances.

■ The association objects on the ground that the basis for this section is simply the fact that there had previously been such a section, rather than an independent showing that it is necessary to employees' health and welfare.

---

[3]Section 450 provides: "No employer, or agent or officer thereof, or other person, shall compel or coerce any employee, or applicant for employment to patronize his employer, or any other person, in the purchase of any thing of value."

In *California State Restaurant Assn.* v. *Whitlow, supra,* 58 Cal.App.3d 340, 348, the court held that under this section the implied power of the commission to authorize employers in the restaurant industry to take a credit for meals furnished to employees against the minimum wage otherwise due employees would be limited to situations in which such manner of payment was authorized by specific and prior voluntary employee consent.

The trial court found, and we agree, that, "A lesson taught by experience since 1947 concerning a thirty minute [lunch] period, not to mention the fact that no great change in mankind's makeup has been noted in the past thirty years that would indicate he now needs either more or less time to eat than he did thirty years ago both provide an adequate basis."

Where the evidence clearly supports an existing order, and where the most basic demands of an employee's health and welfare are so obvious, the statement of basis describing the history and confirming the finding is sufficient to permit meaningful judicial review. When stating the obvious little detail is required.

*9. Section 12—Rest Periods.*

This section provides a mandatory 10-minute rest period net, for every 4 hours work, without wage deductions.

The statements trace the history of the section, commencing in 1932, and reaffirm that the requirement is reasonable and minimal. They state the opposing views and how the differences were resolved.

Again the association objects because the commission refers to earlier findings rather than solely to its own recent investigation and findings.

Employee welfare demands in this area are so obvious that a statement to that effect is not needed. Just as the consumption process is essential to humankind, so is the elimination process, and these needs have not greatly changed in the last 40 years. With respect to the length of the rest period, it is sufficient to state that experience has shown that 10 minutes is reasonable.

*10. Section 13—Change Rooms and Resting Facilities, and*
 *Section 14—Seats.*

In both of these sections the statements set forth the past history, the experience, the objections and how differences were resolved. They note that it is not rare for a worker to suffer a temporary discomfort which a brief rest will overcome so that the worker may return to work for the advantage of both employer and employee, and further, that humane treatment of a sick employee while temporarily unwell or waiting for transportation home is demanded by the welfare of the employee.

With respect to seats, the commission "continues to find" that humane consideration for the welfare of employees requires that they be allowed to sit at their work or between operations.

The statements reveal that employer proposals were incorporated in this section.

*11. Section 15—Temperature.*

The orders specify minimum and maximum temperatures subject to the nature of the work and weather. The statements trace the history, accord recognition to "industry-wide standards," and conclude that management has a responsibility to make working conditions tolerable for employees. The specified temperatures were adapted to contemporary energy guidelines (60 degrees and 68 degrees).

 The association seems to object solely on the basis that no reasons were stated for the particular temperatures.

Both factual and policy reasons are stated and reasonably supported by the material, and reasonably related to the statutory purpose. It is not necessary that the statements should expressly find that all other alternatives are not consistent with the health and welfare of employees.

*12. Section 16—Elevators.*

 This section was found insufficient and the order invalidated by the trial court. The commission has cross-appealed.

The commission's statements of basis as to this subject simply state that climbing and descending more than three flights of steps "could" be detrimental to the general health and welfare of employees. The trial court found that this was speculative and not reflective of reasoned decision making.

The commission contends that since this section has existed since 1919 as to women, and since no evidence that the physical structure of women has changed, the protection should not be abandoned.

This is not an area in which the health or welfare interest is obvious or where it is clear that no change has occurred. At least, medical thought with respect to the benefits of exercise has undergone change.

We agree that the statement is speculative and not reflective of reasoned decision making.

*13. Section 17—Lifting.*

The statements are complete, relating history and conflicting positions, and setting forth reasons for the action taken.

 The association's objection is to the jurisdiction of the commission. The association claims that this is a matter solely within the jurisdiction of the Occupational Safety and Health Standards Board (Cal/OSHA).

The statements of basis reflect that the commission asked Cal/OSHA and was told that the board has no plans to regulate this area. There is no defect in the statements of basis as to this provision. The jurisdictional issue will be considered separately.

*14. Summary.*

We conclude that except as to section 16 the statements of basis adequately reflect the factual, legal and policy foundations for the actions taken. The statements show that orders adopted are reasonably supported by the material gathered, including material in previous orders, the evidence presented at the wage board proceedings, and the public hearings.

In those instances where the order turned on factual issues, the statements demonstrate support in the record; and where the order depended on policy choices, the statements discuss the risks, alternatives, economic and social consequences, where appropriate, and show how the commission resolved the conflicts in adopting the orders. (*California Hotel & Motel Assn.* v. *Industrial Welfare Com., supra,* 25 Cal.3d 200, 213-214.)

Certain sections of the statements differentiate among the different industries covered. For example, order 3-76 applying to the canning, freezing and preserving industry, provides for conditions when an employee may work up to 72 hours in 7 consecutive days. In each case the statements show that "the distinctions drawn are reasonably supported by the administrative record and are reasonably related to the purposes

of the enabling statute." (*Id.*, at p. 214.) Since the association has not cited specific areas it contends are inadequate, we will not undertake a detailed discussion of the differences.

### III. FEDERAL PREEMPTION

 The association contends that the orders are preempted by the National Labor Relations Act and federal labor policy.

In support of this contention the association cites numerous cases applying the preemption doctrine to frustrate state laws affecting collective bargaining, and directed at regulating unions or collective bargaining activities. The association cites, as the best expression of the policy of federal preemption within the federal labor law context, the following statement from Cox, *Labor Law Preemption Revisited* (1972) 85 Harv. L. Rev. 1337, 1338, 1352: *"These decisions clearly established that federal law and federal procedures alone govern the obligations of employers in relation to the organizational activities of employees, and of the employer and employee representatives in collective bargaining, . . .*

". . . . . . . . . . . . . . . . . .

". . . An appreciation of the true character of the national labor policy expressed in the NLRA and LMRA indicates that in providing a legal framework for *union organization, collective bargaining, and the conduct of labor disputes*, Congress struck a balance of protection, prohibition, and laissez faire in respect to union organization, collective bargaining, and labor disputes *that would be upset if a state could also enforce statutes or rules of decision resting upon its views concerning accommodation of the same interests."* (Italics added.)

The authorities are inapposite to the orders here in question. There is no attempt in these orders to regulate organizational activities of employees or of employer-employee collective bargaining activities.

The provision of the National Labor Relations Act (NLRA) which describes the entitlement created by the act is contained in 29 United States Code Annotated section 157 which provides as follows: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the pur-

pose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title."

One basic purpose of this section giving employees the right to engage in concerted activities for the purpose of collective bargaining was to prevent the states, as to employment relations which affect interstate commerce, from treating otherwise lawful activities to aid unionization as an illegal conspiracy merely because they were undertaken by many persons acting in concert. (*Auto. Workers* v. *Wis. Board* (1949) 336 U.S. 245, 258 [93 L.Ed. 651, 665, 69 S.Ct. 516], overruled on other grounds in *Machinists* v. *Wisconsin Emp. Rel. Comm'n.* (1976) 427 U.S. 132 [49 L.Ed.2d 396, 96 S.Ct. 2548].)

However, there is nothing in the act to suggest that it was intended to divest the states of authority to set minimum working condition requirements.

In granting a writ of mandate to compel the State Department of Industrial Relations to enforce certain orders regulating minimum wages, maximum hours and working conditions of women and minor agricultural workers, the Court of Appeal considering an argument of federal preemption had this to say: "State regulation of wages, hours and working conditions, particularly affecting women and minors, has been such a widely and long-established feature of American life that this argument comes as a distinct surprise. Doubtless it would arouse equal surprise in the halls of the federal Congress. Preemption is primarily a matter of congressional intent. While not all the components of the 'comprehensive' federal plan contain noninterference or saving clauses, several such clauses are so prominent as to foreclose any possibility of misapprehensions touching congressional intent. One such clause, which has been a part of the Fair Labor Standards Act ever since its enactment in 1938, declares (29 U.S.C.A., § 218): 'No provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter or a maximum workweek lower than the maximum workweek established under this chapter. . . .' Another was enacted as part of the Civil Rights Act of 1964. (Public Law 88-352 [78 Stat. 253] 42 U.S.C.A., § 2000e et seq.) A basic provision of that law prohibits employers from indulg-

ing in 'unlawful employment practices' by discriminating against employees because of race, color, religion, sex or national origin. (42 U.S.C.A., § 2000e-2.) It carries a clause evincing a purpose to shelter consistent obligations owed under state law (42 U.S.C.A., § 2000e-7): 'Nothing in this subchapter shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter.' [Fns. omitted.]" (*Rivera* v. *Division of Industrial Welfare* (1968) 265 Cal.App.2d 576, 602-603 [71 Cal.Rptr. 739].)

Moreover, the argument that the NLRA forms a part of a comprehensive plan designed to divest the states of all power to regulate conditions of labor is contrary to judicial decisions. (See *San Diego Unions* v. *Garmon* (1959) 359 U.S. 236, 239-241 [3 L.Ed.2d 775, 779-781, 79 S.Ct. 773].)

While a specific regulation of the Industrial Welfare Commission may conceivably overlap the area of regulation reserved by federal legislation and may actually conflict with such regulation (see *United Air Lines, Inc.* v. *Industrial Welfare Com.* (1963) 211 Cal.App.2d 729 [28 Cal.Rptr 238]), this does not occur automatically simply by reason of an extension to male employees of regulations previously applicable to women and minors.

There is certainly nothing in the federal Civil Rights Act to suggest a congressional intent to abrogate state legislation fixing minimum wages, hours and working conditions for women. (*Rivera* v. *Division of Industrial Welfare, supra*, 265 Cal.App.2d 576, 604.)

Even in the sphere of state regulation of union activities and unfair labor practices, preemption does not result merely because of the existence of the NLRA and other federal laws. In *Farmer* v. *Carpenters* (1977) 430 U.S. 290, 296-297 [51 L.Ed.2d 338, 348, 97 S.Ct. 1056], the Supreme Court stated, "We have refused to apply the pre-emption doctrine to activity that otherwise would fall within the scope of *Garmon* if that activity 'was a merely peripheral concern of the Labor Management Relations Act. . . [or] touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act.'"

It is clear that the regulation contained in the orders which are the subject of this lawsuit are within the scope of permissible state regulation. The Supreme Court in passing on the state's power to regulate alien laborers had this to say: "States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State. Child labor laws, minimum and other wage laws, laws affecting occupational health and safety, and workmen's compensation laws are only a few examples. California's attempt in § 2805(a) to prohibit the knowing employment by California employers of persons not entitled to lawful residence in the United States, let alone to work here, is certainly within the mainstream of such police power regulation. Employment of illegal aliens in times of high unemployment deprives citizens and legally admitted aliens of jobs; acceptance by illegal aliens of jobs on substandard terms as to wages and working conditions can seriously depress wage scales and working conditions of citizens and legally admitted aliens; and employment of illegal aliens under such conditions can diminish the effectiveness of labor unions." (*De Canas* v. *Bica* (1976) 424 U.S. 351, 356-357 [47 L.Ed.2d 43, 49, 96 S.Ct. 933].)

We conclude that these orders are not automatically preempted by the existence of any of the federal laws or regulations cited. Moreover, the association failed to demonstrate in the trial court that there is any specific provision in the orders in conflict with federal regulation. Judging from the argument set forth in the brief filed in this court, the association's contention is that the mere existence of the federal statutes preempts state regulation. Failing that, the next line of attack seems to be that the mere existence of collective bargaining agreements between some of the 500 employers represented by the association and their employees ousts the state of jurisdiction to regulate minimum wages and conditions of employment, not only for the employees covered by such collective bargaining agreements but for the thousands, perhaps millions of workers not covered by such agreements.

The association cites no authority for such a sweeping divestiture and none exists. If it is contended that any provision is in conflict with, and therefore preempted by federal law, or by a bargaining agreement protected by federal law, it is incumbent upon the association to demonstrate this by evidence in the trial court and by citation to such material in this court. This the association has failed to do.

## IV. OVERLAPPING JURISDICTION WITH CAL/OSHA

██ The association contends that the commission failed to meet the requirements of section 1173 in that it (1) failed to properly consult with Cal/OSHA prior to implementing its orders; (2) delegated its statutory responsibility to its staff; and (3) regulated in areas in which Cal/OSHA has exclusive jurisdiction.

Section 1173 states in pertinent part as follows: "Before adopting any new rules, regulations, or policies, the commission shall consult with the Industrial Safety Board [Occupational Safety and Health Standards Board] to determine those areas and subject matters where the respective jurisdiction of the commission and the Industrial Safety Board overlap. In the case of such overlapping jurisdiction, the Industrial Safety Board shall have exclusive jurisdiction, and rules, regulations, or policies of the commission on the same subject have no force or effect."

First, the association contends that consultation with Cal/OSHA was inadequate because there was only one joint meeting of the board and the commission. Additional consultation was carried on between members of the staffs of the two agencies. The association argues that this does not satisfy the requirements of the section as interpreted by the court in *Henning* v. *Industrial Welfare Commission of the State of California* (1975) 76 Lab. Cas. (CCH) ¶ 53,639. In *Henning* the court held that the commission could not delegate to its staff the responsibilities it had under section 1173. We agree that it could not delegate its responsibilities. However, we agree with the advice given the commission by the Attorney General that the statute does not prescribe what form consultation should take or mandate any specific procedure.

The evidence is that the commission and the board held one meeting and thereafter consulted through staff and written communication. That appears to have been all that the nature of the case required. As we will see, the association has failed to direct our attention to any jurisdictional conflict. Absent overlapping jurisdiction, frequent consultation in formal session could be a waste of time. Confirmation could easily be made through written communication or staff contact.

Moreover, since the regulations being reviewed and extended were not "new" in the sense of regulating areas not previously subject to commission regulation (except with respect to extension of regulations to male employees), extensive consultation was simply not required. The

trial court found that the commission complied with the statutory mandate and there is ample evidence to support that finding.

The association next argues that the commission incorrectly acted upon the assumption that it could legislate in any area not specifically covered by the board's regulations, whereas, the statute provides that in case of overlapping jurisdiction the board shall have exclusive jurisdiction.

Clearly the commission interprets section 1173 to limit the commission's jurisdiction only in cases where the board has asserted jurisdiction. The fact that the commission cleared certain regulations with the board to determine that the board did not have a similar regulation emphasizes the commission's view that section 1173 nullifies commission rules and regulations only when they conflict with the board's regulations.

This is not an erroneous view as association contends. The California Supreme Court has recently adopted the commission's interpretation of section 1173 and concluded that "IWC retains jurisdiction to regulate working conditions related to the health and safety of employees in the absence of any actual conflict with existing Cal/OSHA regulations or policy." (*Industrial Welfare Com.* v. *Superior Court* (1980) 27 Cal.3d 690, 725 [166 Cal.Rptr. 331, 613 P.2d 579].)

The record establishes that no conflict exists in the case of any of the orders challenged in this proceeding.

### V. COMPLIANCE WITH THE CALIFORNIA ENVIRONMENTAL QUALITY ACT

 The association next contends that the commission failed to prepare or file an Environmental Impact Report (EIR) or conduct an initial investigation as required by California Administrative Code, title 14, section 15083,[4] prior to filing a negative declaration.

---

[4]California Administrative Code, title 14, section 15083 also provides: "(c) Contents. A Negative Declaration shall include:

"(1) A brief description of the project; including a commonly used name for the project if any;

"(2) The location of the project and the name of the project proponent;

"(3) A finding that the project will not have a significant effect on the environment;

"(4) An attached copy of the Initial Study documenting reasons to support the finding.

The association also argues that the commission failed to comply with the requirement of Public Resources Code section 21108 in filing its notice of determination only one day prior to promulgation of the orders.

The superior court held that these contentions were barred by the statute of limitations contained in Public Resources Code section 21167. We agree.

Public Resources Code section 21167 provides in pertinent part as follows: "(a) An action or proceeding alleging that a public agency is carrying out or has approved a project which may have a significant effect on the environment without having determined whether the project may have a significant effect on the environment shall be commenced within 180 days of the public agency's decision to carry out or approve the project, or, if a project is undertaken without a formal decision by the public agency, within 180 days after commencement of the project.

"(b) Any action or proceeding alleging that a public agency has improperly determined whether a project may have a significant effect on the environment shall be commenced within 30 days after the filing of the notice required by subdivision (a) of Section 21108 or subdivision (a) of Section 21152.

". . . . . . . . . . . . .

"(e) Any action or proceeding alleging that any other act or omission of a public agency does not comply with the provisions of this division shall be commenced within 30 days after the filing of the notice required by subdivision (a) of Section 21108 or subdivision (a) of Section 21152."

The association contends that subdivisions (b) and (e) are not applicable because neither the notice of determination nor the negative declaration is valid; each one is a nullity; that those statutes of limitations apply only if the agency has made the determination and has undertaken the investigation required by law.

"(5) Mitigation measures, if any, included in the project to avoid potentially significant effects.
". . . . . . . . . . . .
"(e) Public Review. The Negative Declaration shall be made available to the public with sufficient time before the project is approved to provide an opportunity for members of the public to respond to the finding. . . ."

As the trial court noted, the association's argument amounts to a contention that only if the agency has filed valid notices of determination and negative declarations will the 30-day statute apply. This flies in the face of the clear language of the statutes which provide that they apply in (b), where it is alleged that the agency has "improperly determined" whether there will be a significant impact and in (e), where it is alleged that agency action or omission "does not comply" with statutory requirements.

That is precisely what the association has alleged in this case.

It seems rather obvious that subdivision (a), the 180-day statute, applies where the agency proceeds without any attempt at compliance, and (b) and (e) apply where compliance is alleged to be defective. This interpretation also makes sense, in that, if an agency proceeds without any effort to comply, interested parties are less likely to receive early notice of the action than where there has been even an insufficient effort to comply.

The trial court correctly held that the association was barred from asserting these alleged defects by the 30-day statute of limitations.

In view of this determination, it is unnecessary to consider whether promulgation of commission's orders is a project within the meaning of the Environmental Quality Act or, if it is, whether the commission properly determined that the orders would not have a significant effect.

## VI. TREATMENT OF EXISTING COLLECTIVE BARGAINING AGREEMENTS

The association contends that the commission's failure to treat all existing collective bargaining agreements equally is arbitrary and unreasonable and argues that for this reason the orders should be invalidated.

Orders 1-76 (covering the manufacturing industry) and 4-76 (covering professional, technical, clerical, mechanical and similar occupations) each contain the following provision: "3. HOURS AND DAYS OF WORK

". . . . . . . . . . . . . . . . .

"...Except as provided in subsections (C), (D), and (F) above, this section shall not apply where the employer is obligated to provide premium wage rates for overtime work and to regulate the number of hours of work pursuant to a written collective bargaining agreement where such agreement covers employees who would otherwise be protected by this Order."

A similar exemption is not included in orders 3-76 (covering freezing and preserving industry), and 8-76 (industries handling products after harvest). The stated reason for this distinction is that collective bargaining agreements in industries covered by orders 1-76 and 4-76 (and others not before us) provide necessary protection for employees while agreements in other industries did not. A more complete statement of the commission's findings in this regard is as follows: "The Commission continues to find, as it has for decades, that certain employers overwork employees who are in a weak position to refuse to work long hours, and that premium pay for overtime is a means of deterring such practices, while permitting occasional longer days when peak work loads require them.

"At the same time it is mindful of the economic impact imposing overtime regulations on industries which have made other arrangements with their employees through collective bargaining. The Commission is aware that such agreements do not always represent strong bargaining power by the employees and that minimal overtime provisions cannot always be presumed to represent a trade-off for other benefits. It has found that its primary responsibility for protecting employees against overwork extends to those without adequate collective bargaining protection. Based on the adequacy of collective bargaining, the Commission has included in Orders 1, 4, 6, 7, 9, 11, and 12 a provision directing that the premium pay and hours provisions of collective bargaining agreements shall prevail over the provisions of basic I.W.C. regulations on Hours and Days of Work. This served to ameliorate the impact on industries in which non-conforming work schedules were balanced by contract provisions improving the welfare of employees in other ways. The Commission did not deem it necessary to include this provision in Order 3, since the collective bargaining contracts in the canning, freezing and preserving industry have long conformed to the I.W.C. pattern, the wage board for the industry was in general agreement on hours, and the small number of employees who are not covered by collective bargaining agreements continue to need the protection of the order."

The association fails to demonstrate that these findings are not supported by the administrative record. In fact, the association does not even discuss the evidence before the commission in the form of employment history or collective bargaining agreements in the industries involved. As the association itself points out, in its argument for federal preemption, the numerous collective bargaining agreements (25 in one industry) of the association's members, which were admitted in evidence in the trial court "are as unique and complex as are the relationships between a particular employer and his employees." Nevertheless, the association fails to demonstrate from the evidence that the commission's findings do not accurately describe the adequacy of the agreements in the industries covered by these orders.

For the foregoing reasons, the judgment of the superior court is affirmed. The order of this court staying enforcement of Industrial Welfare Commission orders 1-76, 3-76, 4-76 and 8-76 is hereby vacated.

Tamura, Acting P. J., concurred.

**KAUFMAN, J.**—I dissent.

I agree with several of appellant's contentions each of which invalidates the commission's orders.

### Statement of Basis

Labor Code section 1177 mandates: "Each order of the commission shall include a statement as to the basis upon which the order is predicated...." As the majority note, the Supreme Court in *California Hotel & Motel Assn. v. Industrial Welfare Com.* (1979) 25 Cal.3d 200, 210-211 [157 Cal.Rptr. 840, 599 P.2d 31], pointed out several functions to be served by the statement of basis, including facilitating meaningful judicial review of agency action; enabling more informed scrutiny by the Legislature and the public of the agency, its decision-making processes and its decisions; and inducing agency action that is reasonable, rather than arbitrary, capricious or lacking in evidentiary support. To perform these functions the statement of basis "must show that the order adopted is reasonably supported by the material gathered by or presented to the commission—through its own investigations, the wage

board proceedings, and the public hearings—and is reasonably related to the purposes of the enabling statute." (*California Hotel & Motel Assn.* v. *Industrial Welfare Com., supra,* 25 Cal.3d at p. 213, fn. omitted.) Statements such as have been made in the case at bench consisting primarily of unsupported conclusions and generalizations made *post facto* serve none of these purposes. Having been made after the fact such statements of basis had nothing to do with promoting reasonable agency action, and inasmuch as they constitute rationalizations for agency actions rather than the true bases of decision, such statements are of little value to a reviewing court nor do they promote informed scrutiny of agency action by the Legislature and the public.

The answer of the majority to appellant's contention that the statements of basis lack reference to the facts is that "[t]he commission, having been relieved of the obligation of meeting any separate requirement, under [Lab. Code] section 1178, that the commission 'investigate and find' that wages, hours, or working conditions were inadequate or prejudicial [by the Supreme Court in *California Hotel & Motel Assn.* v. *Industrial Welfare Com., supra,* 25 Cal.3d at p. 209], may not then be required to set forth findings based upon such a separate investigation." (*Ante,* p. —.) Even if that be so, however, the statements of basis were nevertheless required to "show that the order adopted is reasonably supported by the material...presented to the commission... through...the wage board proceedings, and the public hearings...." (*California Hotel & Motel Assn.* v. *Industrial Welfare Com., supra,* 25 Cal.3d at p. 213.) The court in *California Hotel & Motel Assn.* v. *Industrial Welfare Com., supra,* could not have intended to eliminate the requirement for reference to the pertinent facts in the statement of basis, for although it held that "three legislative pronouncements together relieved the commission, in the present instance, of meeting any separate requirement under section 1178 that the commission 'investigate and find,'" it nevertheless also held that the statement of basis was inadequate, in part because of its failure to include and deal with the pertinent facts. (See 25 Cal.3d at p. 215 [e.g., "The commission did not explain how it distinguished adequate from inadequate collective bargaining agreements."])

In my view the statements of basis are inadequate to serve the purposes enumerated and to meet the standards set forth in *California Hotel & Motel Assn.* v. *Industrial Welfare Com., supra,* 25 Cal.3d 200.

*Labor Code Section 1173—*
*Consultation With Cal/OSHA*

Section 1173 of the Labor Code provides in pertinent part: "Before adopting any new rules, regulations, or policies, the commission shall consult with the Industrial Safety Board *to determine those areas and subject matters where* the respective *jurisdiction of the commission and the Industrial Safety Board overlap. In the case of such overlapping jurisdiction, the Industrial Safety Board shall have exclusive jurisdiction*, and rules, regulations, or policies of the commission on the same subject have no force or effect." (Italics added.)

The duty of the commission to consult with the California Occupational Safety and Health Standards Board (Safety Board) to determine areas in which there is overlap and with respect to which, therefore, the jurisdiction of the Safety Board is exclusive (Lab. Code, §§ 142.3, 1173), may not be delegated by the commission to its staff. (*Henning* v. *Industrial Welfare Commission of State of California* (1975) 76 Lab. Cas. (CCH) ¶ 53,639, 22 Wage Hour Cas. 225, 227.)

The record in the case at bench discloses without contradiction that there was one meeting between the commission and the Safety Board on December 9, 1975. At the meeting the consulting parties were given the misguided advice that they could delegate to their staffs the function of ascertaining and defining those areas in which there was a conflict in jurisdiction. The commission and the board made no determination of the areas of potential conflicting jurisdiction; that statutory duty was left entirely to the staffs.

Even if it could be said that the commission and the board attempted to define the areas of potential jurisdictional conflict, an improper standard was employed. The minutes make abundantly clear that it was the commission's view that it was free to promulgate regulations in any area not yet regulated by the Safety Board regardless of whether or not that area fell within the Safety Board's jurisdiction. After the December 9, 1975, meeting jurisdictional conflict issues were resolved by the commission's staff forwarding proposed orders to the staff of the Safety Board. If the Safety Board's staff had no objection to the proposed order, the commission was free to implement it. A memorandum dated March 8, 1976, outlines the procedure: "In any area where IWC feels that a proposed regulation covering working conditions may overlap with the safety or health jurisdiction of Cal/OSHA, IWC should sim-

ply send a draft of the proposed regulation to Mr. Rinaldi. He will promptly notify IWC if their proposal is in conflict with an existing standard or a standard which is in process of development. [¶]...The IWC should feel free to promulgate regulations where Cal/OSHA has no proposed or existing standards...."

The "construction" of Labor Code section 1173 in *Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 719-725 [166 Cal.Rptr. 331, 613 P.2d 579], to mean that the Industrial Welfare Commission can regulate where Cal/OSHA has not promulgated a conflicting regulation is not yet final, and, hopefully, will be changed before finality. It flies in the face of the very plain language of the statute and constitutes a blatant legislative revision by the court. At the time of the September 9, 1975, meeting, the Safety Board already had regulations covering rest periods, dressing rooms, drinking and washing facilities, lighting, ventilators and elevators. Although admittedly the problem is a perplexing one, in my view there is no question but that many provisions of the commission's orders relate to matters within the exclusive jurisdiction of the Safety Board. The problem was created by the Legislature, and I think it should be left to the Legislature to resolve.

*Conclusion*

I would reverse the judgment.

A petition for a rehearing was denied August 15, 1980.